Charles E. AUSTIN, et al., Plaintiffs,

v.

Reginald WILKINSON, et al., Defendants.

No. 4:01–CV–71.

United States District Court, N.D. Ohio, Eastern Division.

Feb. 25, 2002.

for Constitutional Rights, New York, NY, Jillian S. Davis, American Civil Liberties Union of Ohio, Cleveland, Jules L. Lobel, Pittsburgh, PA, Michael J. Benza, Law Office of Jeffry F. Kelleher, Raymond V. Vasvari, Jr., American Civil Liberties Union of Ohio, Cleveland, Staughton Lynd, Law Office of Staughton & Alice Lynd, Niles, Terry H. Gilbert, Friedman & Gilbert, Cleveland, for Michael Benge, Alonzo L. Bonner, Plaintiffs.

Carol H. O'Brien, Office of the Attorney General, State of Ohio, Corrections Litigation Section, Jeffrey A. Stankunas, Isaac, Brant, Ledman & Teetor, Joseph M. Mancini, Office of the Attorney General, State of Ohio, Corrections Litigation Section, Columbus, Marianne Pressman, Office of the Attorney General, State of Ohio, Corrections Litigation Section, Cincinnati, Mark Landes, Isaac, Brant, Ledman & Teetor, Columbus, for Stephen J Huffman, Bernard J. Ryznar, Todd E. Ishee, Bruce A. Martin, Defendants.

## OPINION AND ORDER

GWIN, District Judge.

In this case, a class of current and former prisoners at the Ohio State Penitentiary ("OSP") says the defendants, all employees of the Ohio Department of Rehabilitation and Correction (the "Department"), violated their constitutional rights by denying them due process in their placement and retention at the OSP. The plaintiffs say conditions at the OSP give rise to a liberty interest because they impose an atypical and significant hardship on the prisoners in relation to the ordinary incidents of prison life. *See Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Despite the existence of this liberty interest, the plaintiff prisoners claim the procedures used by the defendants in transferring them to the OSP and retaining them at the institution deny them due process.

Alice Lynd, Law Office of Staughton & Alice Lynd, Niles, Bill Goodman, Center

Responding, the defendants deny that conditions at the OSP are atypical or impose a significant hardship. In major part, the defendants argue that the Court should compare the plaintiffs' conditions to those of other inmates at the OSP or to inmates in similar facilities in other states when determining whether the conditions are atypical. The defendants alternatively argue that, if a liberty interest is found, they afford sufficient process to the inmates.

From January 2, 2002 through January 10, 2002, the Court conducted a bench trial on this matter at which it heard from twenty witnesses and accepted over one thousand pages of exhibits. After considering all of the evidence, and as hereinafter described, the Court finds that the nature and duration of restrictions at the OSP are conditions not expected by those serving similar incarcerations. The Court makes this determination despite finding that the current operation of the OSP, under the progressive stewardship of Warden Todd Ishee, has greatly improved inmates' treatment. Instead, the Court finds that inmates at the OSP face an atypical and significant hardship even under Warden Ishee's sensible leadership.

In laying out its decision, the Court first describes the conditions at the OSP. Next, the Court discusses its holding that con-finement at the OSP is an atypical and significant hardship in relation to the ordinary incidents of prison life. After discussing the nature of the confinement at OSP, the Court considers the process afforded to inmates in challenging their initial placement and subsequent retention at the OSP. Finally, the Court discusses the appropriate remedy for the constitutional violation that it finds.

I. Factual Background and Discussion

In this case, the plaintiffs represent a class of current and former inmates at the OSP. They sue certain state officials for violation of their constitutional rights under 42 U.S.C. § 1983.[1] The plaintiffs sue the named defendants in their official capacities only for purposes of injunctive relief. Originally, the plaintiffs' suit alleged that the defendants operation of the OSP was a violation of a number of the inmates' Eighth and Fourteenth Amendment rights. The parties have settled most of the claims. The only claim left at trial was the plaintiffs' claim that the defendants violated their right to due process in the selection and retention of inmates for the OSP.

A. Purpose of the Ohio
State Penitentiary

The OSP is a high maximum security facility, also known as a "supermax" facility, located in Hubbard, Ohio, near the city of Youngstown.[2] Constructed in reaction

---

1. Plaintiffs sue Reginald Wilkinson, the director of the Ohio Department of Rehabilitation and Correction, Stephen J. Huffman, the former warden of the Southern Ohio Correctional Facility and the North Regional director of the Department, Bernard J. Ryznar, chief of the Department's Bureau of Classification, Todd E. Ishee, the warden at the OSP, Cheryl Jorgensen–Martinez, the Department's chief inspector, and Matthew Meyer, the Security Threat Group investigation coordinator for the Department.

2. The National Institute of Corrections defines a supermax prison as:

[a] freestanding facility, or a distinct unit within a freestanding facility, that provides for the management and secure control of inmates who have been officially designated as exhibiting violent or seriously disruptive behavior while incarcerated. Such inmates have been determined to be a threat to safety and security in traditional high-security facilities and their behavior can be controlled only by separation, restricted movement, and limited access to staff and other inmates.

Chase Riveland, *Supermax Prisons: Overview and General Considerations* 3 (1999).

to the April 1993 riot at the Southern Ohio Correctional Facility at Lucasville, the OSP supermax prison first received inmates in May 1998. The OSP was designed to house 504 male inmates in single-inmate cells. The OSP was designed as "a more secure facility, to handle prisoners who were hellbent on disrupting the orderly operation of our correctional institutions." (Wilkinson Dep. at 8). Ohio intended the OSP be "a location in the state that we can separate the most predatory and dangerous prisoners from the rest of the Department of Rehabilitation and Correction's general population." (Wilkinson Dep. at 24–25).

The OSP carries out this goal primarily through solitary confinement—extended periods of incarceration in which the inmate is kept alone in his cell and has minimal contact with the outside world. In other prisons, this type of confinement is commonly referred to as "segregation." The stark conditions and psychological consequences of solitary confinement at the OSP are noticeably different than at other Ohio prisons.

Before describing the conditions at the OSP, the Court notes that it was presented with evidence at trial suggesting that Ohio does not need a high maximum security prison or does not need one with the capacity of the OSP. Peter Davis, a member of the Ohio Parole Board and former executive director of the Correctional Institution Inspection Committee of the Ohio General Assembly, testified about the Department of Rehabilitation and Correction's use of the J–1 cellblock at the Southern Ohio Correctional Facility. The Southern Ohio Correctional Facility is Ohio's only maximum security prison, the security level immediately below the OSP's

high maximum security level.[3] The J–1 area is a self-contained cellblock of twenty cells that has tighter access requirements and allows less movement of inmates than a typical maximum security cell at the Southern Ohio Correctional Facility. The J–1 cellblock is the most restrictive cellblock within the Southern Ohio Correctional Facility. Before the OSP opened, the J–1 cellblock was the most restrictive and isolated cellblock in the Ohio prison system. (Davis Test. at 117–19).

Suggestive that Ohio never needed the 504–inmate capacity of the OSP, before the OSP was built, Ohio did not fill the J–1 cells at the Southern Ohio Correctional Facility. (Davis Test. at 119). Instead, Ohio faced a different problem. It did not have a sufficient number of maximum security cells, the level below the OSP's high maximum security cells. The deficit of maximum security cells and the surplus of high maximum cells causes an imbalance in assigning inmates to appropriate confinement.

In December 1998, a Department of Rehabilitation and Correction quality review team made up entirely of correctional officials reviewed the operations at the OSP.[4] The quality review report supports the plaintiffs' claim that no clear standard describes which inmates would be placed at the OSP:

> When asked about the inmate population for which OSP is intended most all respondents cite "the worst of the worst." This concept has proven difficult to operationalize, particularly when we go beyond the 200 or so inmates who are clearly OSP material. Identifying those inmates who represent the "lighter" end of high maximum has become clouded

---

3. At the time of trial, Ohio assigned prisoners to one of five security levels: minimum, medium, close, maximum, or high maximum.

4. The team included a former warden of the Southern Ohio Correctional Facility and the Department's chief counsel, among others.

by the overlap and similarity in characteristics among high close, maximum, maximum A.C. and high maximum inmates.

(Pls.' Ex. 10 at 2).

The Department of Rehabilitation and Correction assigns inmates to the OSP from a conflicted position. The opening of the OSP has created too much capacity for the highest level of security. At the same time, Ohio lacks sufficient capacity at maximum security, the level of confinement below the OSP's high maximum security level. After the huge investment in the OSP, Ohio risks having a "because we have built it, they will come" mind set. As a result, the defendants consider inmates for placement at the OSP who do not need its level of restrictions.

### B. Conditions at the Ohio State Penitentiary

Conditions at the OSP are significantly more restrictive than at other correctional facilities of the Department of Rehabilitation and Correction. First, inmates at the OSP are kept in their single cells for twenty-three hours a day. An inmate's cell measures approximately 89.7 square feet and is sealed with a solid metal door. The cell door has a small, thick glass window. The door also has a "food slot" or "cuff port" that an officer may unlock to insert food or mail, and that is also used to put handcuffs on the prisoner before the door is opened. Inmates eat all meals alone in their cells.

The Department has made the cells more isolated by installing metal strips to the bottom and sides of the cells doors at the end of 2000. Before installation of the metal strips, the doors had half-inch gaps along the sides and two- to three-inch gaps along the bottom. The Department installed the strips ostensibly to stop the throwing of urine or feces, although the defendants did not give specific testimony

of the frequency of such incidents. The Department does not use these metal strips at any other institution.

The OSP cells have a narrow outside window that cannot be opened. These small windows do not comply with the square footage standard established by the American Correctional Association. An inmate has no control over the heating and cooling of his cell or the amount and temperature of air blowing through the cell. The cells are sparsely furnished, containing only a sink, a toilet, a small desk, and an immovable stool. Inmates sleep on a narrow concrete slab with a thin mattress, a pillow, a pillow case, a blanket, and a set of sheets. A light remains on at all times, although the light can be dimmed. The Department strictly limits the personal property an inmate may have at the OSP.

An inmate at the OSP may only leave his cell for one hour a day. During that hour, inmates have access to a recreation area with two rooms. In one of these rooms, the inmates can use minimal exercise equipment. In the other room, a slot with a grate that is approximately six inches wide by four feet high allows outside air to circulate through the room. The room gives the sensory impression of a closed room with a small screen opening to the outdoors. Both recreation rooms are cells within the building. Until recently, recreation for all inmates at the OSP was solitary. Now, however, a limited number of inmates at the OSP may have recreation with one other prisoner.

The ceiling height of the recreation rooms do not meet the American Correctional Association's established standard. After auditing the conditions at the OSP, the American Correctional Association also found that the OSP did not comply with its standards for outdoor recreation.

The OSP is significantly more restrictive than other Ohio correctional facilities, including those facilities housing inmates under administrative control.[5] The other

---

**5.** Administrative control is highly restrictive solitary confinement. *See* Ohio Admin. Code

Ohio Department of Rehabilitation and Correction facilities do not lack outdoor recreation.[6] In contrast to inmates at the OSP, inmates in administrative control on death row at the Mansfield Correctional Institution have outdoor recreation, more access to personal property, more access to telephone usage, and more access to counsel. (Jason Robb Test. at 153–54).

Administrative control prisoners at the Lebanon Correctional Institution, Orient Correctional Institution, and Lorain Correctional Institution live in open-faced cells. The Lebanon facility allows administrative control inmates access to basketball courts and work-out areas. At the Southern Ohio Correctional Facility, administrative control inmates live in cells with bars, not solid doors, and have outside recreation available every day. Similarly, the Trumbull Correctional Facility has outdoor recreation. Most important to the quality of conditions, Ohio's other facilities all afford inmates a much greater ability to communicate with other persons. The conditions at the OSP do not allow any amelioration of the prolonged isolation designed into the OSP's structure.

The Department of Rehabilitation and Correction also restricts inmates at the OSP more intensely during the brief periods they are outside their cells. For example, until very recently, the defendants required inmates receiving visitors to be shackled into an uncomfortable "black box" that contorted their wrists. In addition, inmates having visitors are still required to be stripped searched when they leave their cellblock and when they reenter the cellblock. The OSP subjects inmates to these searches even though the visits are made through solid windows that do not allow any possible contact with the visitor.

The Department also limits contact between fellow OSP inmates. As described above, inmates always eat alone. They usually exercise alone, although now some inmates may occasionally exercise with one other inmate. Inmates are not permitted to share books, magazines, or other personal property. With the exception of some recently introduced group counseling sessions, inmates have almost no verbal communication with any other individual.[7] The defendants' expert, James Austin, described this:

Q: When you were there, did you observe inmates communicating with one another?

A: No. I observed there was some indications where they have two inmates who are recreating together, but I didn't—I didn't notice much communication because the inmates were almost always being brought out in isolation with no—I didn't see any contact with other inmates except for those situations in the housing units where they could recreate together.

(Austin Test. at 1020).

The OSP's limitation upon communication contrasts with conditions at other correctional facilities, including administrative

§ 5120–9–13 (2001). Inmates at various Ohio institutions are placed in administrative control for, among other reasons, prison rule infractions.

6. The defendants presented evidence that the Department will seek funds to construct outdoor recreation spaces at the OSP. If approved by the Office of Budget and Management, the request will be submitted to the Ohio General Assembly. Whether the General Assembly approves funding for the outdoor recreation area in its 2002 capital budget will not be known until June 2002.

7. Group counseling sessions are conducted by placing inmates in adjacent bar-fronted cells so that each inmate can see the counselor and hear the other inmates.

control units at Ohio's other prisons. For example, inmate James DeJarnette testified that inmates in administrative control at the Orient Correctional Institution can easily communicate through their bar doors. Such communication is next to impossible in the OSP with metal strips around the edges of the solid metal cell doors.

Once at the OSP, an inmate faces different levels of restriction based on the classification level to which he is assigned. There are three classification levels, and the levels are assigned to discipline and to reward. After orientation, the OSP classifies most inmates at Level II. After approximately one or two years without problems, inmates can progress to Level III with attendant additional privileges. Similarly, the OSP assigns inmates who violate prison rules to Level I. Level I is the most restricted confinement possible and may last for an indefinite period of time. At Level I, prisoners receive no visitors except for their attorneys and receive no phone calls apart from calls with their attorneys or for family emergencies.

At the OSP, inmates are normally allowed to make one ten-minute phone call a week. Under the Department's new policy, effective March 1, 2002, inmates will only be allowed two ten-minute calls a month. Under the same policy change, the Department will reduce recreation outside the cell from seven one-hour periods per week to five one-hour periods a week.

At the OSP, inmates do not participate in any prison-based work. One inmate per cellblock is responsible for keeping the area tidy. Except for the rare visitor and one hour a day of recreation, inmates remain in their cells. The OSP has no educational programs beyond the GED level. Instructional programs come to inmates through closed-circuit television and self-study workbooks. Most mental health programs available to the inmates also come through the small black and white television sets inmates are allowed in their rooms.

In conclusion, inmates at the OSP live under significantly different conditions than prisoners at Ohio's other correctional facilities, including those prisoners with maximum security classifications and those prisoners with maximum security classifications who are currently in administrative control.

The Court now turns to a discussion of the defendants' current procedures for selecting which inmates are placed at the OSP.

### C. Selection Procedures and Consequences of Placement at the Ohio State Penitentiary

The plaintiffs challenge the procedures the Department of Rehabilitation and Correction uses to select inmates for placement and retention at the OSP. Regarding placement at the OSP, the Department first transferred inmates to the OSP in early May 1998. At the time of this initial transfer, the Department had no policy in effect identifying which inmates could suitably be placed at the OSP. Without any transfer policy in place, the Department simply relied upon wardens to choose inmates for transfer. Without any set criteria, similarly situated inmates were often treated differently. Peter Davis, an Ohio Parole Board member and former director of the Ohio General Assembly's prison oversight committee, testified:

The only thing that's clear is, as I've said here, for every inmate that was cited to me and the reasons why that person was sent there, for this particular act, this assaultive behavior, if you will, we knew for a fact of plenty other inmates that were at other institutions, even close security institutions, that were not transferred there.

My frustration was trying to understand how the criteria was being applied, whether or not it was being applied consistently at all institutions on referral, whether or not it was being applied consistently at central office level in those determinations.

Just simply was no way to understand how one assaultive inmate could get high max placement and other assaultive inmates could not.

(Davis Test. at 126).

On August 31, 1998, the defendants attempted to establish some predictability to placement at the OSP by issuing Department of Rehabilitation and Correction Policy 111–07 ("Policy 111–07"). The defendants issued this policy after a large number of inmates had already been transferred to the OSP. The policy described behavioral criteria that referral committees at Ohio's prisons should consider before recommending an inmate to the OSP. The policy was based on a April 15, 1998, memorandum by Regional Directors Norm Hills and Eric Dahlberg. The current version of Policy 111–07 used to transfer inmates to the OSP became effective on January 28, 1999.

The Department's review of an inmate's placement at the OSP differs from the review inmates receive when they are placed into administrative control at other Ohio prisons. At other prisons, the administrative control committee can release an administrative control prisoner without a classification review. In contrast, release from the OSP requires an inmate to be reclassified from high maximum security to maximum security.

An inmate at the OSP is considered for reclassification only once a year. This reclassification process includes several levels of review. Initially, an OSP inmate has a hearing before a three person reclassification committee. The reclassification committee is composed of an OSP deputy warden, a designee of the Department's North Regional Director, and a Department mental health professional. Under the Department's reclassification process, the OSP reclassification committee makes an initial recommendation of whether an inmate should stay at the OSP or be reclassified and transferred to a maximum security prison.

After the committee makes its recommendation, the OSP warden reviews the decision and reaches his own conclusion. He makes this review without notice to the inmate of any additional factors not considered by the reclassification committee. After review and decision by the OSP warden, the chief of the Bureau of Classification reviews both the committee's recommendation and warden's decision. Finally, after the chief of the Bureau of Classification has approved or disapproved of the committee's recommendation, the Department's North Regional Director makes the final decision.[8]

After reviewing the evidence presented at trial on the issue, the Court questions how much consideration is given to the review of each inmate's reclassification recommendation. Within the Bureau of Classification, Chief Bernard Ryznar reviews all reclassifications involving the OSP inmates. In addition to this task, he supervises a staff of nine and reviews each administrative control placement in Ohio's 44,000 inmate population. (Ryznar Test. at 638). Although his co-workers assist him, Chief Ryznar is also responsible for authorizing each of the thousands of trans-

---

**8.** The Court discusses below the Department's adoption of a new classification policy that goes into effect on March 1, 2002. When the policy becomes effective, the chief of the Bureau of Classification will make the final decision about whether an inmate at the OSP is reclassified.

fers within the Department of Rehabilitation and Correction each year. (Ryznar Test. at 618, 638). He personally reviews each maximum security placement. He also reviews other placement issues that are brought to him, and he supervises the placement recommendations of his staff. Finally, he alone makes at least 400 high maximum security classification decisions each year. (Ryznar Test. at 638–39).

North Regional Director Stephen J. Huffman has even more responsibilities than Chief Ryznar that distract him from time needed to review high maximum security classifications. The Department's Regional Directors essentially manage all aspects of the correctional facilities within their geographic area. Classification decisions are a very small part of their responsibilities in running a huge organization.

Placement and retention at the OSP has immense consequences for some inmates. As described above, the OSP conditions are significantly more restrictive than the conditions at other prisons. In addition, initial placement at the OSP denies some inmates the chance to be considered for parole because of a Department policy. The Department has a policy, approved by Director Wilkinson, that prevents inmates in maximum security facilities from being paroled.

> Any inmate with a maximum security classification or any other classification title utilized to denote the most serious security risk inmates, at the time of release eligibility, shall not be granted release ... Release at any such projected release date shall be conditioned upon the inmate receiving a security classification less than maximum, or any other security classification title utilized to denote the most serious security risk inmates.

(Pls.' Ex. 3 at 8). Therefore, no inmate in the OSP's high maximum security classification can be paroled.

### 1. James DeJarnette

Inmate James DeJarnette's case exemplifies the effect placement at the OSP has on parole eligibility. Convicted of armed robbery with a firearm specification, DeJarnette began serving an indeterminate sentence of three to fifteen years on April 22, 1993. While housed at the Orient Correctional Institution on a medium security classification, DeJarnette assaulted a correctional officer while intoxicated. The Orient Correctional Institution discipline committee unanimously agreed DeJarnette should be punished by being placed in administrative control at his current prison. The discipline committee also unanimously agreed against increasing his classification level and transferring him to the OSP. The Orient Correctional Institution's warden agreed with the discipline committee.

Despite these recommendations and the dismissal of the criminal indictment against DeJarnette arising from the assault, the chief of the Bureau of Classification increased DeJarnette's security classification three levels to high maximum and transferred him to the OSP in October 1998. DeJarnette was sent to the OSP without notice or explanation of why the Orient Correctional Institution's discipline committee and warden's recommendations were ignored.

While at the OSP, DeJarnette participated in programming and mainly complied with all prison rules. The only exceptions were attempting to share a newspaper with another inmate and being found with an altered radio because a screw had come out of the radio cover. After fourteen months at the OSP, DeJarnette received a classification review. In December 1999, the reclassification committee, made up of three Department employees pursuant to Policy 111–07, examined DeJarnette's security classification.

The committee recommended that he remain at the OSP. Warden Ishee and the chief of the Bureau of Classification concurred with the recommendation.

As the result of DeJarnette's three-level increase to high maximum security, he was automatically denied parole when he appeared before the Ohio Parole Board in August 2000.[9] Parole board guidelines recommend that a first-time offender like DeJarnette receive parole after serving forty-eight to sixty months. Because of DeJarnette's high maximum security classification, he could not be paroled even though he had served over ninety months. The parole board's records explain its thinking:

"Inmate serving 1st adult commitment. He is currently high max security with next screening[,] next security screening 12/2000. He has served above the recommended range. However, his security status prevents a release recommendation. Time assessed to get inmate to earliest appointment for reduction to close [security] ... Requiring 19 additional months to serve until next [hearing] eligibility." [10]

(Pls.' Ex. DeJarnette–9 at 2)

After receiving this indication from the parole board that he would qualify for release if he could move to an appropriate security level, DeJarnette again appeared before the OSP reclassification committee in November 2000. This time the reclassification committee recommended that DeJarnette's security classification be reduced and he be removed from the OSP, saying DeJarnette had made a "good adjustment" and was "not a behavioral problem." (Pls.' Ex. DeJarnette–11). Despite

this recommendation for a reduction in security level classification, the OSP warden, Chief of the Bureau of Classification, and the North Regional Director all decided against reducing DeJarnette's security classification. Importantly, the North Regional Director never heard from DeJarnette before deciding to keep him at the OSP, never fully explained his reasons behind the decision, and never told DeJarnette what issues prevented a reduction in his security level.

DeJarnette's case is especially troubling because increases or decreases in an inmate's security classification level usually occur one level at a time. Jumping multiple security levels is the exception and not the rule. (Ryznar Test. at 628). After the Department reviewed the OSP's operation in December 1998, the review team reported:

Some Wardens believe that an inmate must progress through close security and maximum security before being considered an appropriate high maximum placement. Although this requirement is not found in either the original Memorandum regarding high maximum (Appendix C) or the policy on maximum security (111–07, Appendix D), there appears to be a strong perception among institutional personnel that this procedure must be followed.

(Pls.' Ex. 10 at 4–5).

## 2. Daryl Heard

Inmate Daryl Heard's experiences also highlight the consequences of placement at the OSP. His case further demonstrates the defendants' willingness to disregard a reclassification committee's recommenda-

---

**9.** James DeJarnette was denied parole in June 1999 for the same reason.

**10.** Under the Department rules, inmates can only be paroled from a close, medium, or minimum security level classification. Al-

though DeJarnette met the parole board's guideline for release, he also needed to complete successfully a period, usually twelve months, at the maximum security classification before being moved to a close security classification.

tion concerning an inmate's security level. After conviction in 1982 for aggravated robbery, aggravated burglary, and kidnaping, Heard worked his way down to a minimum security classification. In March 2000, the Orient Correctional Institution Rules Infraction Board brought rule violation charges against Heard for involvement with a scheme to bring marijuana into the prison. He was convicted of those charges and disciplined by being placed into local control for fifteen days. Additionally, his security classification was increased from minimal to medium. In June 2000, his case was submitted for possible high maximum placement. Because of his attempt to smuggle in marijuana seven months earlier, the chief of the Bureau of Classification ultimately recommended his security level be increased three levels to high maximum.[11] In October 2000, Heard was transferred to the OSP.

When deciding to increase Heard's security classification four levels, the Department noted that Heard had not been involved in violence in the last sixty months. He served over three years at the minimum security classification without any incident prior to the marijuana involvement.

On December 18, 2001, Heard had a parole hearing. At the time of the hearing, Heard had served 235 months of incarceration. The parole board guidelines suggested Heard should be paroled after serving between 156 and 192 months. (Heard Test. at 289). Heard was denied parole because of his high maximum security classification. Recognizing the impact of the Department's rule against paroling inmates classified as maximum or high maximum security, the parole board asked Heard to contact it immediately if he obtained a close security classification so another hearing could be scheduled. (Heard Test. at 293).

### 3. Keith Gardner

Inmate Keith Gardner's case gives a further example of the effect placement at the OSP has on parole eligibility. Now forty-four years old, Gardiner has been in prison since age nineteen for a murder conviction. Having served twenty-five years, he has served more time than the parole board guidelines suggest. The Department transferred Gardner to the OSP in November 1998 after an incident in which another prisoner was stabbed. The state prosecuted Gardner for the stabbing. At trial, Gardner argued self-defense, an affirmative defense to which Gardner had the burden of proving by a preponderance of the evidence. *See* Ohio Rev.Code § 2901.05(C); *see also State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240, 1244 (2002).[12] The jury acquitted Gardner, finding that he acted in self-defense.

11. Under policies governing assignment to the OSP in effect at the time, it is not clear how the Department elevated Heard four levels to the high maximum security classification at the OSP. The Department's Policy 111–07 controlled placements to the OSP at that time. That policy states, in part:

 VI. Procedures:

 A. Assignment Criteria. Inmates will be recommended for and assigned to high maximum security when *all* of the following factors are present:

 1. The inmate is or is about to be classified as maximum security;

 . . . .

 3. The inmate presents the highest level of threat to the security and order of the department and its institutions, in the professional judgment of the classifying official.

(Pls.' Ex. 1) (emphasis added).

 At the time the Department transferred Heard to the OSP, he was not at a maximum security classification. After his involvement with the drug offense, his classification level was only increased one level to medium security while he was in local control at the Orient Correctional Institution.

12. The *Barnes* court stated:

 To establish self-defense, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the

Despite the acquittal, the Department increased Gardner's security classification and transferred him to the OSP in April 1999. While at the OSP, Gardner had no rule violations and he participated in numerous programs. In both 2000 and 2001, the reclassification committee reviewed his security classification and recommended that the Department reduce Gardner's security classification. In 2000, Mansfield Correctional Institute Warden Baker, serving as a member of the reclassification committee, told Gardner he "shouldn't even be here." (Gardner Test. at 387). In addition, written on Gardner's 2000 form filled out by the reclassification committee is the comment: "Placement to OSP questionable. No recent disciplinary action after A/C release 1/98." (Pls.' Ex. Gardner–3). On both occasions, the committee's recommendation was rejected, and Gardner was kept at a high maximum security classification.[13] In rejecting the committee's recommendation to decrease Gardner's security classification, the Department principally based its decision upon the stabbing incident of which he was acquitted years earlier.

As with Heard and DeJarnette, the Department's decision to retain Gardner at the OSP rendered him ineligible for parole. Gardner has served more than twenty-five years of his original sentence of life with a possibility of parole after fifteen years. However, the Department's rule forbidding parole release from high maximum security denied the parole board an opportunity to exercise its discretion.

### D. Review of Inmates Once at the Ohio State Penitentiary

As demonstrated by these accounts, the Department's procedures for reviewing an OSP inmate's classification do not provide the prisoner a hearing or even access to the individual deciding the inmate's security classification. The Department's procedures for initially moving someone to the OSP also suffer from the same lack of notice and opportunity for hearing.

For instance, the Department sent more than one hundred inmates to the OSP before adopting its Policy 111–07 concerning such transfers. While lacking a formal policy, the Department transferred inmates under the guidance of the April 15, 1998, memorandum from Regional Directors Hills and Dahlberg. The memorandum informs wardens that inmates will be assigned to high maximum security when:

> The inmate is or is about to be classified as maximum security;
>
> The inmate has demonstrated behavior which meets high maximum security criteria; and/or
>
> The inmate presents the highest level of threat to the security and order of the department, in the professional judgment of the classifying official.

(Joint Ex. 19).[14]

---

situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*Barnes,* 94 Ohio St.3d at 24, 759 N.E.2d at 1244.

**13.** Interestingly, the warden of the OSP agreed with the reclassification committee's recommendation to reduce Kevin Gardner's security classification in 2000 but did not agree with the recommendation in 2001. The warden disagreed with the committee's recommendation because of Gardner's "[e]xtensive history of [assaults] and predatory acts." (Pls.' Ex. Gardner–5 at 2). However, this history must also have existed in 2000 as Gardner had no rules violations between his 2000 and 2001 reclassification hearings. (Pls.' Ex. Gardner–5 at 2).

**14.** The memorandum lists the following behavior as criteria for classification to high maximum security status:

> The inmate's conduct or continued presence at the sending institution poses a seri-

The memorandum's lack of specificity and guidance made it almost worthless in describing which inmates should be assigned to the OSP. In addition, the vast majority of inmates initially transferred to the OSP in 1998 neither received advance notice that they were being considered for transfer nor a hearing to contest their transfer. Only a few inmates received posttransfer hearings.

In support of their argument that some transfers and reclassification decisions are so irrational as to violate due process, the plaintiffs presented strong evidence showing that many of the Department's decisions to transfer and retain inmates at the OSP were made with little support. Perhaps there are no transfers to the OSP with less support than those of Kevin Roe and Lahray Thompson.

### 1. Kevin Roe

On January 26, 1989, the Cuyahoga County Court of Common Pleas sentenced Roe on a rape conviction. During his twelve years in prison, Roe had only minor rule violations, principally involving the use of marijuana. He was not charged with any rule violations in the two years before his transfer to the OSP.

In January 1999, the Southern Ohio Correctional Facility dealt with increased tensions caused by a series of assaults among inmates identified as gang members of either the Aryan Brotherhood or the Crips. No evidence suggested Roe was directly involved in any of the incidents.

During this same time, Roe received his annual classification review. After a hearing on January 20, 1999, the reclassification committee recommended raising his security classification from maximum to high maximum even though the board's behavior worksheet indicated he should be considered for a security level decrease.[15] The committee's justification for its recommendation was that Roe was a longtime member of a gang and had participated in a racial disturbance over five years ago. (Pls.' Ex. Roe–2 at 2). Roe was not given notice that these issues would be used to increase his security classification. Furthermore, the committee does not explain why this evidence, without any proof of Roe's involvement in incidents at the prison, was sufficient to increase Roe's classification in January 1999, but that same evidence did not warrant an increase in his security classification in May 1998, when the OSP first began accepting prisoners.

Four days after his classification review, another inmate assaulted Roe by hitting him over the head with a spatula while Roe was standing in a food line. The control unit hearing board presiding over the disciplinary charge brought against the other

ous threat to the physical safety of any person, or to the security of the prison;
The nature of the inmate's criminal offense indicates that the inmate poses a serious threat to the physical safety of any person, or to the security of the prison;
The need to contain, prevent or quell a disturbance or riot;
A conspiracy to introduce contraband which may pose a serious threat to the security of the prison;
The inmate functions as a leader or enforcer of a security threat group;
The inmate poses a serious threat or escape; or

The inmate has demonstrated an ability to compromise the integrity of staff.
(Joint Ex. 19).

15. The committee used a supervision review form containing a formula that assists in making security classification recommendations. The formula assigns an inmate up to ten positive points for "unfavorable behaviors" and up to three negative points for "stability factors." (Pls.' Ex. Roe–2). These subtotals are added and applied to a chart. The form directs that an inmate with an aggregate negative score should be considered for a supervision decrease. Roe scored a value of negative one on his review form. (Pls.' Ex. Roe–2).

inmate acknowledged that Roe did not fight back. (Pls.' Ex. Roe–1). The Department never charged Roe with a rule violation for having gotten hit in the head from behind. Furthermore, the Department's Security Threat Group Coordinator Matthew Meyer testified:

Q: Did he [Roe] get in any fights before that? Before he got hit in the head, was he involved with anything?

A: Not that we are aware of, sir.

(Meyer Test. at 1106).

Once Roe left the Southern Ohio Correctional Facility's medical area he was transferred to the OSP. He did not receive notice of his impending transfer or an opportunity to challenge his upgraded security status. In an attempt to quiet sentiments at the Southern Ohio Correctional Facility, along with Roe, the warden sent approximately twenty other inmates to the OSP. Many of these inmates were transferred even though they had no current misconduct and the Department never made out or proved a rule violation associated with gang membership or other security threat group.[16]

At a closed hearing, Security Threat Group Coordinator Meyer testified regarding the evidence the Department relied on in its decision to assign Roe to high maximum security. Coordinator Meyer described violence and gang member gatherings in 1999 that did not involve Roe. Also, Coordinator Meyer never talked with Roe, and the evidence did not show that Roe had any connection with the incidents surrounding the 1999 gang disputes. Even considering the evidence generously, at best it shows that Roe may have had some past connection to the Aryan Brotherhood. However, the Department's own rules require evidence of a leadership position in a security threat group before sending an inmate to the OSP. The defendants offered no credible evidence that Roe held a leadership position.

Nonetheless, Roe's high maximum security classification has continued for more than two years after the tension at the Southern Ohio Correction Facility has passed. Roe received a reclassification committee hearing in April 2000. Under the Department's formula, he scored a negative three on his supervision review form, the best score possible. The reclassification committee recommended his release from high maximum security, commenting:

[Roe w]as sent to OSP from general population 2 months after incidents. Was not involved in incident in library [word or words redacted] only involvement. He was hit with a spatula in chow hall. It appears he was assigned to OSP based on [word redacted] history in 97. Only 4 tickets during incarceration. No assaults or violence.

(Pls.' Ex. Roe–6).

The warden approved the committee's recommendation but Chief Ryznar denied it, stating that the "[inmate's security threat group] activity directly led to assaults, fights and disturbance at [Southern Ohio Correctional Facility]." (Pls.' Ex. 6).

In February 2001, Roe received another reclassification committee hearing. Once again, Roe scored a negative three on his supervision review form. Once again, the reclassification committee recommended reducing his security classification. The warden agreed. However, once again, Chief Ryznar disagreed with the recommendation to reduce Roe's security classification, stating "[r]ecommend continue high max. Involved in conduct that result-

---

**16.** Security Threat Group Coordinator Matthew Meyer testified that his group has identified more than 900 different security threat groups in Ohio's prisons. (Meyer Test. at 1080). The groups range from very small, disorganized neighborhood groups to sophisticated and organized terrorist groups. (Meyer Test. at 1080).

ed in disturbance at SOCF." (Pls.' Ex. Roe–10).

The Court is perplexed by Chief Ryznar's decision keep Roe at the OSP. The Court is even more troubled by Roe's lack of notice and opportunity to contest the reasons for which he was transferred. Although nothing presented in the trial's closed session appeared confidential, the Court does not more fully describe the testimony out of an abundance of caution. It is sufficient to say that the Court has reviewed all of the Department's records on Roe and finds nothing to support Chief Ryznar's assertion he was involved in the 1999 incidents at the Southern Ohio Correctional Facility. The evidence of Roe posing an ongoing threat is exceedingly weak.

Roe's behavior and threat do not even meet the standards of the defendants' own classification expert, James Austin. At trial, Austin describes these standards with regard to gang affiliation:

Q: Could you give us examples of the type of thing [conduct that warrants long-term placement at OSP] you are thinking of?

A: Inciting a riot, killing an officer, killing an inmate; you know, a history, a history of assaults on staff or inmates even though death may not occur, but every time this inmate comes out; a member of a Security Threat Group who is clearly the organizer of this group, and whenever this person is released a lot of bad things start happening wherever he or she may be.

Q: Not someone who is just identified as a leader, but there's got to be clearly some concrete evidence that this person in a particular prison leads to riots or leads to something bad happening?

A: Yeah, that type of person.

(Austin Test. at 1045). Nonetheless, Chief Ryznar decided to keep Roe at Ohio's most secure, and most expensive,[17] classification without much evidence and without giving Roe a hearing or informing him of the evidence leading to his retention at the OSP.

### 2. Lahray Thompson

The defendants offered even less evidence justifying the placement and retention of inmate Lahray Thompson at the OSP. In January 1999, Thompson was present at a fight at the Southern Ohio Correction Facility involving members of antagonistic gangs. The defendants never brought rule violations against Thompson to the Rule Infraction Board for a hearing. The Department's confidential security threat group file on Thompson makes no mention of what role, if any, Thompson played in the fight.

Nonetheless, Thompson was transferred to the OSP. In transferring Thompson to OSP, the Department never clearly defined Thompson's role in the incident but determined that he was affiliated with a gang. (Pls.' Ex. Thompson–2 at 3). Thompson was not given notice that he might be classified to high maximum or an opportunity to defend against the gang affiliation charge before his transfer.[18]

---

**17.** The annual cost per inmate at the OSP is $49,007.44, while the annual cost per inmate at the maximum security Southern Ohio Correctional Facility is $34,167.24. *See* Ohio Dep't of Rehab. & Corr., *Ohio State Penitentiary, at* http://www.drc.state.oh.us/public/osp.htm (last modified Feb. 5, 2002); Ohio Dep't of Rehab. & Corr., *Southern Ohio Correctional Facility, at* http://www.drc.state. oh.us/public/socf.htm (last modified Feb. 5, 2002).

**18.** Further demonstrating the uncertainty regarding the evidence against Thompson, at a reclassification hearing held at the OSP in February 2000, the committee commented: Ticket does not specify who he was fighting. Very generic. Inmate does not have any

Justifying the process used to send Thompson to the OSP, the defendants first say that Thompson indicated affiliation with the Crips while in his early teens living in California. Second, the defendants presented evidence Thompson once had a tattoo often associated with the Crips. Third, the defendants offered evidence that Thompson once wrote a letter using the letter "b" in a fashion sometimes used by Crips members to disrespect rival gangs. Finally, the defendants produced a summary report that said Thompson was present at the time of the January 1999 fight. The report did not further describe his role, if any, in the incident.

The defendants have not shown the Court that Thompson was involved in gang related conduct, save the uncertain evidence that he may have been involved in the January 1999 fight. Even if Thompson had participated in the January 1999 fight, under the Department's own guidelines, his placement to the OSP appears unjustified. The edition of Policy 111–07 relevant to Thompson's transfer says that an inmate can be recommended for placement at the OSP if his behavior shows he "functions as a leader or enforcer of a security threat group." (Pls.' Ex. 1). Chase Riveland, one of the defendants' experts, supports this standard, giving his opinion that mere gang membership does not justify placement in an overly restrictive prison like the OSP. (Riveland Test. at 924–26).

Despite the minimal evidence used to support Thompson's placement to the OSP, the defendants have continued to keep him at a high maximum security clas-

sification. Thompson has not had a rule infraction citation while at the OSP. In both 2000 and 2001, the OSP's reclassification committee recommended reducing Thompson's security classification. However, on both occasions, he was ultimately denied a classification reduction.[19]

The treatment of Thompson and Roe reflects a troublesome trend where the defendants deny reclassification based upon gang activity without giving the inmates notice and an opportunity to respond. Equally troublesome, reclassification is denied based on exceedingly weak evidence and alleged activity years in the past. In Thompson's case, he has been held in near solitary confinement for more than three years based on nothing more than the way he writes the letter "b," the fact that in 1999 he was with a group involved in a dispute, and his association with Crip members more than fifteen years ago while growing up in southern California.

Warden Ishee better described what the rule should be:

Q: [These particular words] require the Security Threat Group coordinator to determine that a particular prisoner is an active member of a Security Threat Group or a Security Threat Group behavior.

And just as a matter of clarification, do you understand the word "active" to mean current member of a Security Threat Group or currently engaging in Security Threat Group behavior?

gang related tickets or any fighting or assault tickets in his record. It appears he has been mixed up with inmate Capone 293–878 who is ID'd as Crip leader. (Pls.' Ex. Thompson–4).

**19.** Interestingly enough, in 2000, the OSP's warden agreed with the reclassification com-

mittee's recommendation to reduce Thompson's security classification, but in 2001, the OSP's warden disagreed with the same recommendation even though nothing about Thompson's situation had changed. (Pls.' Exs. 3–6).

A: I think currently within a reasonable time frame. You know, if we, if we use the word "Current" exactly, that would have had to have been an action that just occurred or occurred within the last few days.

Q: Well, what would seem to you a reasonable time frame?

A: Within the-the period of review that applies to this instrument.

Q: That is, within the past year?

A: Generally, yes.

(Ishee Test. at 586–87).

Challenging the process afforded to inmates transferred to the OSP, the plaintiffs say the absence of process results in the OSP using a large amount of its expensive and restrictive capacity to house inmates involved with using or bringing drugs into a correctional facility. Currently, the OSP houses more than fifty inmates whose only rule violations are their involvement with drugs while in an Ohio prison.

In an unusually large percentage of cases, Chief Ryznar overrules the OSP reclassification committee's recommendations. Over a one-year period, the reclassification committee held 369 hearings on inmates at the OSP. Of those 369 hearings, the reclassification committee recommended reducing 157 inmates' (43%) security classifications. (Defs.' Ex. O at 9). But ultimately, the Regional Director only recommended seventy-one inmates (19%) for a security reduction. (Defs.' Ex. O at 9). In contrast, Riveland, the defendants' expert and former head of the State of Washington's prison system, testified that he did not often overturn a committee recommendation concerning a high maximum security classification.[20]

In defending his reviews, North Regional Director Huffman simply says that he is more conservative and might have security threat group information not available to the reclassification committee. (Huffman Test. at 1141). The Court was not overly persuaded by this testimony as the security threat group information involved in the cases of Roe and Thompson hardly shows an ongoing threat even if one were to stretch and find a gang association in the first place. While the Court agrees that reviewing individuals should be conservative, the issue here is not about releasing these inmates from prison. The inmates would simply be classified as maximum security, a level at which they remain subject to severe restrictions.

Against this factual backdrop, the Court now turns to a discussion of the law controlling its determination of the plaintiffs' procedural due process rights. In this discussion, the Court considers new policies that the defendants plan for the future. As discussed below, the Department's new rules improve upon its current procedures but still do not provide the plaintiffs with adequate due process.

## II. Discussion of Procedural Due Process

■ Criminal incarceration does not end all constitutional protections. *See Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see also Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (right to be free from cruel and unusual punishment); *Cruz v. Beto,* 405 U.S. 319, 321–23, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (right to freedom of religion); *Johnson v. Avery,* 393 U.S. 483, 485, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (right of access to the courts).

---

**20.** Riveland testified:

Q: Can you comment on the frequency with which you overturned the committee?

A: The frequency of overturning the committee recommendation was not common, but it did occur.

(Riveland Test. at 934).

■ Although prisoners do not lose all constitutional rights, they are subject to additional restrictions upon those rights. *See Turner v. Safley*, 482 U.S. 78, 95–97, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (holding that the fundamental right to marriage is subject to limitations as a result of incarceration); *Pell v. Procunier*, 417 U.S. 817, 827–28, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (restricting inmates' first amendment right to access to news media). Generally, prisoners retain those rights compatible with the objectives of incarceration. *See Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Vitek v. Jones*, 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (noting that incarceration deprives inmate of right to freedom from confinement).

Despite prisoners' retention of certain constitutional rights, federal courts have been hesitant to interfere with the administration of prisons. *See Sandin v. Conner*, 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (noting that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment"); *Turner*, 482 U.S. at 85, 107 S.Ct. 2254 (stating that the separation of powers doctrine should caution judicial intervention in prison administration because it is an area traditionally governed by the state legislative and executive branches); *Rhodes v. Chapman*, 452 U.S. 337, 352, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (stating that courts should exercise judicial discretion rather than assume prison administrators are insensitive to prisoners' constitutional rights).

In this case, the plaintiffs say that the defendants violated their right to procedural due process. The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. As the plaintiffs were not deprived of life or property, they are only entitled to due process if they were deprived of "liberty" within the meaning of the Fourteenth Amendment.

■ The consideration of a due process claim goes through two steps. First, the Court asks whether a liberty or property interest exists with which the state has interfered. *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); *Pusey v. City of Youngstown*, 11 F.3d 652, 656 (6th Cir.1993). Second, the Court determines whether the procedures attendant upon that deprivation were constitutionally sufficient. *See Thompson*, 490 U.S. at 460, 109 S.Ct. 1904; *Pusey*, 11 F.3d at 656.

■ More specifically, the plaintiffs must plead and prove that state remedies for redressing the alleged violation are inadequate. *See Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir.1999) (citing *Vicory v. Walton*, 721 F.2d 1062, 1066 (6th Cir. 1983)). The Sixth Circuit has elaborated on this requirement:

> In other words, a party may maintain a procedural due process § 1983 case in federal court if he alleges and proves that there was a constitutional violation under color of law and: (1) The state did not have a remedy; or (2) the state had a remedy but it was deemed inadequate; or (3) the state had an adequate remedy in form, both procedurally and in damages, but the state did not apply it or misapplied its remedy.

*Id.* With these elements in mind, the Court now analyzes the plaintiffs' due process claim.

### A. The Plaintiffs' Protected Liberty Interest

To succeed on their procedural due process claim under 42 U.S.C. § 1983, the

plaintiffs must first demonstrate they possessed a protected liberty interest and were deprived of that interest without due process. *See Thompson,* 490 U.S. at 460, 109 S.Ct. 1904; *Pusey,* 11 F.3d at 656.[21]

In *Sandin,* the Court revisited its earlier decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Court found that an inmate confined to administrative segregation did not have a liberty interest "independently protected by the Due Process Clause" because "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt,* 459 U.S. at 468, 103 S.Ct. 864. Nevertheless, the Court went on to hold that because Pennsylvania state law had established "specific substantive predicates" that must exist before restrictive confinement could be imposed, the inmate had a protected liberty interest in avoiding such confinement. *Id.* at 471–72, 103 S.Ct. 864.

*Sandin* rejected much of *Hewitt*'s reasoning. Specifically, the Court rejected *Hewitt*'s conclusion that a court had to ask whether "the State had gone beyond issuing mere procedural guidelines and had

used 'language of an unmistakably mandatory character' such that the incursion on liberty would not occur 'absent specified substantive predicates.'" *Sandin,* 515 U.S. at 480, 115 S.Ct. 2293 (quoting *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. 864). The Court found *Hewitt* had created disincentives for states to codify their prison management procedures and led to the involvement of federal courts in the day-to-day management of prisons. *See id.* at 482, 103 S.Ct. 864.

In order to correct these unwanted side effects, the Court held that liberty interests in the prisoner context "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484, 103 S.Ct. 864. Although *Sandin* rejected *Hewitt*'s methodology, the Court continued to "recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Id.* at 483–84, 103 S.Ct. 864. In deciding whether the state had created a liberty interest, the *Sandin* Court emphasized that "the real concerns undergirding the liberty protected by the

---

21. The defendants first argue that the plaintiffs' claims are barred by *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997). In *Heck,* the Court ruled that a damage claim implicating the validity of a conviction or sentence is not valid under § 1983 until the conviction or sentence has been overturned. *See Heck,* 512 U.S. at 486–87, 114 S.Ct. 2364. In *Edwards,* in the context of a prison disciplinary proceeding leading to segregated confinement, the Court held that "the respondent's claim for declaratory relief and money damages, based on allegations ... that necessarily imply the invalidity of the punishment imposed, is not cognizable under § 1983." *Edwards,* 520 U.S. at 648, 117 S.Ct. 1584. The defendants say that the plaintiffs' substantive and procedural due process claims call

into question the validity of the administrative determinations affecting their continued confinement and should be barred.

The defendants' argument does not persuade. The plaintiffs are not seeking money damages or judicial invalidation of their initial transfers to the OSP. The plaintiffs seek prospective injunctive relief for adequate due process in the Department's transfer and retention decisions concerning the OSP. In fact, *Edwards* specifically states that seeking prospective injunctive relief under § 1983 is proper. *See id.* The Court does find that little or no evidence supports some of the Department's transfer and retention decisions. However, those findings are only used to support the plaintiffs' claim they should receive adequate process in the Department's future decisions, not to invalidate the Department's past decisions.

Due Process Clause," *id.* at 483, 115 S.Ct. 2293, were whether the state deprived the prisoner of "an interest of 'real substance,'" *id.* at 480, 115 S.Ct. 2293 (quoting *Wolff,* 418 U.S. at 557, 94 S.Ct. 2963). *Sandin* "shift[ed] the focus of the liberty interest inquiry" away from "the language of a particular regulation" and back to "the nature of the deprivation." *Id.* at 481, 115 S.Ct. 2293.

Therefore, the Court must determine whether the nature of confinement at the OSP is an "atypical and significant hardship" giving rise to a protected liberty interest. This inquiry raises "many complex and fact-specific issues." *Brown v. Plaut,* 131 F.3d 163, 170 (D.C.Cir.1997).

In deciding whether placement at the OSP is atypical,[22] the Court must first choose an appropriate comparison. The plaintiffs argue the conditions at the OSP are atypical when compared to prisoners in administrative control. On the other hand, the defendants argue that the appropriate comparison is with the conditions at the OSP itself: "Ohio often transfers 'high security risk' inmates to OSP, the conditions of which are more restrictive than the sending prisons. Subjecting inmates to those conditions, which are no different from those ordinarily experienced by other similarly situated inmates in OSP is not 'atypical.'" (Defs.' Final Argument Br. at 12).

The Court rejects the defendants' suggested comparison. In *Sandin,* the Court said no claim could arise when the conditions of confinement were within the range that could reasonably be expected as a normal incident of incarceration. *See Sandin,* 515 U.S. at 484, 115 S.Ct. 2293. However, the Court did not suggest that the existence of a condition somewhere within

a state's prison system automatically made such a condition normal.

The courts of appeals have used varied comparisons. The Fourth and Ninth Circuit use the general prison population as the comparative baseline. *See Beverati v. Smith,* 120 F.3d 500, 504 (4th Cir.1997); *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir.1996). In contrast, the Second and Third Circuits use the typical conditions of administrative segregation when deciding whether conditions are atypical. *See Griffin v. Vaughn,* 112 F.3d 703, 708 (3d Cir. 1997); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). Taking a different approach, the Seventh Circuit has defined the baseline as the conditions of nondisciplinary segregation in the state's most restrictive prison. *See Wagner v. Hanks,* 128 F.3d 1173, 1175 (7th Cir.1997). According to the Fifth Circuit, segregation never implicates a liberty interest unless it lengthens a prisoner's sentence. *See Carson v. Johnson,* 112 F.3d 818, 821 (5th Cir.1997). The remaining circuits have applied *Sandin*'s "atypical and significant hardship" test without characterizing the comparative baseline. *See Bass v. Perrin,* 170 F.3d 1312, 1318 (11th Cir.1999); *Perkins v. Kan. Dep't of Corr.,* 165 F.3d 803, 809 (10th Cir.1999); *Kennedy v. Blankenship,* 100 F.3d 640, 642 (8th Cir.1996); *Dominique v. Weld,* 73 F.3d 1156, 1160 (1st Cir.1996). The Sixth Circuit has not clearly described the appropriate comparison that the Court should use. *See Mackey v. Dyke,* 111 F.3d 460, 463 (6th Cir. 1997).

The Court finds that the better approach is to compare the range of prison conditions experienced by the plaintiffs against the complete range of conditions experienced by a broad range of similarly situated inmates. Placement in adminis-

---

**22.** Rather than repeat the phrasing an "atypical and a substantial hardship," the Court uses the word "atypical" as shorthand for both considerations unless specifically noted.

trative control for limited periods of time is not an atypical change that imposes a significant hardship. But to determine whether the plaintiffs' placement at the OSP is atypical in relation to ordinary prison life, the Court must consider the duration and extent of the deprivation because "especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir.1999).

When viewed against this standard, the Court finds that the conditions at OSP are atypical and impose a significant hardship. In reviewing this issue, the Court begins with the time an inmate is held at the OSP. The vast majority of inmates placed at the OSP will remain for a minimum of two years, with only an annual review of their status. To date, two hundred OSP prisoners have been there for more than three years.

This lengthy stay is a function of the current OSP procedures. Upon arrival at the OSP, inmates complete a month long orientation program and are then assigned to Level II. At the inmate's reclassification hearing, conducted approximately a year after arrival, the inmate may progress from Level II to Level III. Only once an inmate is at Level III may he be reclassified to the less severe maximum security status. Because reclassification hearings are only held annually, even inmates with exemplary behavior rarely progress through OSP in less than two years.

In contrast, inmates in administrative control or disciplinary control at other Ohio institutions, including the maximum security Southern Ohio Correctional Facility, are reviewed every thirty days. Terry Collins, the Department's deputy director of institutions, testified that:

The most you can do in a disciplinary control cell at one time is 30 days. Typically the arrangements there are anywhere from one to 15 days. You could be placed there—if there's a spree of offenses that you go before the Rules Infraction Board on, you could be placed there for 30 days. Typically that stay is one to 15 days.

(Collins Test. at 1176–77).

He also testified that high maximum security incarceration at the OSP is qualitatively different than any other placement in the Department's prisons:

Q: And those categories of incarceration, Mr. Collins, those will all be philosophically institutionally distinct from high max status, won't they?

A: There—yes, most definitely different than high max facility.

Q: High max will be intended for a different sort of inmate?

A: Yes.

Q: Will have a different sort of restrictive environment?

A: Yes.

(Collins Test. 1175–76).[23]

Even with good behavior, inmates at the OSP serve indefinite terms at the institution. With the exception of the end of their sentences, there is no other indication of how long an individual inmate will be kept at the OSP.

In addition to inmates' indefinite retention at the OSP, the Department treats inmates at the OSP qualitatively differently than it treats inmates at other Ohio prisons. With regard to isolation, death row inmates have access to true outdoor recreation and have direct access to attorneys. Most significantly, death row pris-

---

**23.** Terry Collins testified that disciplinary control inmates, unlike OSP inmates, do not

even have limited television privileges and programming. (Collins Test. at 1176).

oners can interact with other inmates during recreation or by conversations in their cells.

In contrast, inmates at the OSP have extremely limited contact with other individuals. The inmates remain alone in their solid-door cells for twenty-three hours a day. Metal strips along the cell doors do not allow conversation with adjacent inmates. Only a small, inoperable window allows the inmate to view the outside his cell. A correctional officer only opens the small "cuff-port" in the cell door to affix handcuffs or to drop off food. An OSP prisoner only goes outside the building in the rare case of a necessary medical procedure or a court appearance.

Without contradiction, inmate Jason Robb testified that he had not been outside the walls of the OSP for four years:

> Q: I see. When is the last time you were outside the building at OSP?
>
> A: Today was the first time in about four years.
>
> Q: Since the day that you came?
>
> A: Yeah, since the day that I arrived in May of '98, I've never been outside of the institution except for today.

(Robb Test. at 197).

Inmates at the OSP also are never allowed outdoor recreation. Their closest contact to the outdoors is exercise in a completely enclosed room with a grated opening approximately six inches wide and four feet long. The Court finds it hard to believe anyone would seriously suggest such a space constitutes "outdoor" recreation. The lack of outdoor recreation is important to the Court as denial of outdoor recreation can impair a liberty interest:

> Furthermore, deprivation of yard time imposes enough of a hardship to qualify as a constitutionally protected liberty interest. As noted previously, although the plaintiffs were deprived of only two hours of yard time per week, the mar-

ginal value of those two hours to a person in Close Management is substantial. Such a deprivation is therefore atypical and significant even in solitary confinement.

*Bass,* 170 F.3d at 1318.

In those instances when the OSP inmates are allowed out of their cells, they are escorted by two or three officers. In contrast, inmates on death row walk without a hands-on escort. At the OSP, when inmates leave their cellblock, they are strip-searched, shackled, and placed in full restraints, which include an uncomfortable rigid "black box" enclosing their hands. Inmates at the OSP are strip-searched before and after meeting visitors even though physical contact with visitors, who are behind solid glass, is impossible. In all, other correctional facilities have significantly less intrusive conditions than the OSP.

In addition, confinement at the OSP affects the duration of some inmates' incarceration. The plaintiffs do not argue that this impact on parole eligibility creates a liberty interest. Instead, they only argue that it is one factor, among many, showing that placement and retention at the OSP imposes an atypical and significant hardship. The Court agrees.

In *Hewitt,* the Court observed that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate" and hence, the need to maintain the inmate in restricted housing must be subject to meaningful "periodic review" by prison officials. *Hewitt,* 459 U.S. at 477 n. 9, 103 S.Ct. 864; *see also U.S. v. Johnson,* 223 F.3d 665, 673 (7th Cir.2000).

Similarly, in *Mackey v. Dyke,* 29 F.3d 1086 (6th Cir.1994), a pre-*Sandin* decision, the Sixth Circuit stated that "[t]here is little difference between depriving a person of liberty without due process of law, on the one hand, and failing to restore

someone's liberty after any legal justification for its deprivation has been eliminated, on the other hand." *Mackey*, 29 F.3d at 1090–91 (quoting *Childs v. Pellegrin*, 822 F.2d 1382, 1388 (6th Cir.1987)); *see also Butts v. Dutton*, No 87–6249, 1989 WL 73653, at *4 (6th Cir. July 6, 1989) (stating that *Hewitt* "clearly established" that a prisoner has a due process right not to be confined in administrative segregation as a pretext for indefinite confinement); *Riley v. Johnson*, 528 F.Supp. 333, 340 (E.D.Mich.1981).

The Department's formal policy stops consideration of parole for prisoners in the high maximum or maximum security classifications. (Pls.' Ex. 3 at 8). To receive parole, an OSP inmate must first be reclassified to maximum security. Once he spends approximately a year at maximum security he may be reclassified to close security and be eligible for parole.

The plaintiffs show convincing evidence of the significant consequences of this rule. Inmates DeJarnette and Heard were both at lower security classifications before being found guilty of misconduct. In both cases, the rules infraction board recommended that they not be sent to the OSP. Their wardens agreed. However, without offering DeJarnette any chance to appear or respond to the issues considered in denying the rule infraction board's recommendation, Chief Ryznar increased DeJarnette's security classification three levels from medium to high maximum.

Similarly, Heard was classified at minimum security facility before involving himself in a conspiracy to import marijuana. After a hearing, the Orient Correctional Institution Rules Infraction Committee recommended a one-level increase to a medium security classification in conjunction with local control punishment. Without a hearing, the Chief Ryznar disregarded the committee's recommendation and increased Heard's security classification four levels to high maximum.

Once in the OSP, DeJarnette and Heard were both denied reductions in their security classification even though they had no significant rule violations. Both inmates were denied reductions even though the OSP's reclassification committee recommended reductions after their reclassification hearings. Chief Ryznar's denial of reclassification has meant years of additional incarceration for DeJarnette and Heard.[24]

■ After considering the total context of confinement at the OSP, the Court finds conditions at the facility impose an atypical and significant hardship. First, the combination of conditions that the OSP inmates face, such as their isolation, the way they are controlled, and their inability to go outside, even for recreation, differs significantly from conditions in other Ohio prisons. Second, the length of confinement under these conditions makes confinement at the OSP atypical. Many inmates have continued in this extremely restrictive environment for four years without explanation.

Therefore, because the conditions at the OSP impose an atypical and significant hardship, the Court holds the inmates have a liberty interest.

---

24. Discussed below, Chief Ryznar often denies an inmate's reclassification against the recommendation of the committee with minimal explanation. Such cursory treatment does not give the inmate any opportunity to challenge the basis for Chief Ryznar's decision or to know what he must do to win a reduction in classification. The defendants' expert on classification, James Austin, testified this is not appropriate: "I mean, you have to give reasonable explanation as to why the person is being kept there." (Austin Test. at 1034).

**B. Minimal Due Process Requirements**

Having determined that the plaintiffs have a liberty interest, the Court now turns to a discussion of what process the plaintiffs were due before the defendants sent them to the OSP.

The Supreme Court's decisions in *Wolff* and *Hewitt* describe the procedural safeguards afforded to prisoners who have demonstrated protected liberty interests. In *Wolff*, a prisoner alleged the procedures surrounding the disciplinary proceedings used to revoke his good time credits violated his due process rights. In fashioning the procedures needed to protect the prisoner's due process rights, the Court introduced a balancing test weighing "institutional needs and objectives" against "the provisions of the Constitution that are of general application." *Wolff*, 418 U.S. at 556, 94 S.Ct. 2963. The Court found that certain procedures were necessary if the "minimum requirements of procedural due process [were] to be satisfied." *Id.* at 563, 94 S.Ct. 2963.

Under *Wolff*, a prisoner must receive "advance written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken." *Id.* Regarding the timing of the notice, *Wolff* held that "a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance before the Adjustment Committee." *Id.* at 564, 94 S.Ct. 2963. The inmate must be allowed to appear at the hearing and be allowed adequate time to prepare a defense. *See id.* The inmate should also be allowed to call witnesses and present documentary evidence as long as "permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.* at 566, 94 S.Ct. 2963. However, the ability to present a defense does not extend to the right to cross-examination or confrontation. *See*

*id.* at 567–68, 94 S.Ct. 2963. Nor is the inmate entitled to the right to counsel. *See id.* at 569–70, 94 S.Ct. 2963.

In *Wolff*, the Court also found that due process required the disciplinary body give some explanation for the action ultimately taken:

> We also hold that there must be a "written statement by the factfinders as to the evidence relied on and reasons" for the disciplinary action. Although Nebraska does not seem to provide administrative review of the action taken by the Adjustment Committee, the actions taken at such proceedings may involve review by other bodies. They might furnish the basis of a decision by the Director of Corrections to transfer an inmate to another institution because he is considered "to be incorrigible by reason of frequent intentional breaches of discipline," and the[y are] certainly likely to be considered by the state parole authorities in making parole decisions. Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. Further, as to the disciplinary action itself, the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others.

*Id.* at 564–65, 94 S.Ct. 2963 (internal citations omitted).

Furthermore, *Wolff* held that such procedural requirements were not limited to disciplinary proceedings dealing with time credits, but extended to disciplinary pro-

ceedings for segregation as well. *See id.* at 571 n. 19, 94 S.Ct. 2963. The Court held that "[a]lthough the complaint put at issue the procedures employed with respect to the deprivation of good time, ... the same procedures are employed where disciplinary confinement is imposed." *Id.*

In contrast, *Hewitt* considered the amount of process due a prisoner when prison officials transferred him to restrictive confinement for the "administrative," rather than the disciplinary, reason of investigating his role in a prison riot. Reviewing whether he was afforded due process in this administrative segregation, the Court gave prison authorities greater deference:

> We think an informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation ... So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Hewitt,* 459 U.S. at 476, 103 S.Ct. 864. Although a hearing need not occur prior to confinement in administrative segregation, it "must occur within a reasonable time following an inmate's transfer." *Id.* at 476 n. 8, 103 S.Ct. 864.

*Hewitt* also requires periodic review of an inmate in administrative segregation. [A]dministrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates.

> This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner.

*Hewitt,* 459 U.S. at 477 n. 9, 103 S.Ct. 864.

Under *Wolff* and *Hewitt,* the amount of process a prisoner requires depends on whether the prisoner's transfer is characterized as disciplinary or administrative. In deciding the nature of the transfer, nomenclature is less important than the substance of the transfer. Regardless of the defendants' characterization of the transfer and retention of inmates at the OSP, it is not clear that all transfers to the OSP were administrative.

*Hewitt* involved the administrative segregation of an inmate for a relatively short period of time during an investigation into the cause of a prison riot. Once the investigation was complete, the inmate was found guilty of two misconduct charges. *Hewitt,* 459 U.S. at 464–65, 103 S.Ct. 864. Because the inmate in *Hewitt* was to face a rule infraction board and have the increased procedural protections associated with that disciplinary entity, he had less interest in procedural protections for the short time that prison authorities sent him to administrative control pending the investigation.

On the other hand, placement or retention at the OSP is for a significantly longer time than the temporary administrative segregation at issue in *Hewitt.* In addition, the inmate in *Hewitt* was eventually afforded a hearing marked by the more rigorous due process protections that ac-

company disciplinary segregation. In contrast, prisoners assigned to the OSP, especially those segregated for alleged gang affiliations, at best receive only one hearing before their transfer to the OSP. In light of the lengthy and indeterminate time inmates are held at the OSP, the minimal procedural requirements of *Hewitt* are insufficient.

An additional consideration for affording OSP inmates increased procedural protections is that inmates facing disciplinary control face less punishment than inmates facing placement at the OSP. In *Wolff,* the Court established heightened procedural protections for inmates facing disciplinary or punitive proceedings. Currently, inmates appearing before rule infraction boards are entitled to these heightened protections even though the possible sanctions are less than the consequences of assignment to the OSP. A serious rule violation "may be penalized by disciplinary isolation and/or suspension of privileges and qualified rights for a period up to thirty days." Ohio Admin. Code § 5120:1–8–13(C)(2) (2001). "The maximum penalty for rule violations arising from one incident must be no more than sixty days." Ohio Admin. Code § 5120:1–8–13(D) (2001). Inmates transferred to the OSP face conditions more severe than a prisoner in disciplinary segregation and will face them for a much greater period of time. Therefore, at a minimum, inmates at the OSP should be afforded the same procedural protections as those described in *Wolff.*

■ Further support that the OSP inmates are entitled to the protections described in *Wolff* is found in the underlying factors that govern all decisions regarding what process an individual is due. In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court set forth three factors to consider when deciding what procedural protections an

individual requires. First, courts consider the private interest affected by the state action. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. Second, courts consider how great the risk is that the procedures used will come to an erroneous decision, and whether additional procedural protections would sufficiently reduce a risk of mistake. *Id.* Finally, courts consider the government's interest, including whether additional procedural protections would place undue fiscal and administrative burdens upon the state. *Id.; see also Washington v. Harper,* 494 U.S. 210, 229, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) ("The procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case.").

■ As discussed above, the Court has found that confinement at the OSP imposes an atypical and significant hardship when compared to confinement in other Ohio prisons. Therefore, placement and retention at the OSP substantially affects one of the most basic private interests of the OSP inmates.

As it currently exists, the Department's procedure for selecting and retaining inmates at the OSP has great potential for error. Evidence at trial demonstrated a wide disparity between the recommendations of the reclassification committee, the OSP's warden, Chief Ryznar, and the North Regional Director. The potential for error is magnified by the fact that the North Regional Director, a single individual with responsibilities throughout the entire Department, is given the last decision on placement and retention at the OSP. The potential for error is little improved under the newly proposed system because it merely gives the final decision to the chief of the Bureau of Classification, an individual who also has a multitude of responsibilities and little time to consider each case carefully.

Take the cases of inmates Roe and Thompson. For both, the decision to transfer them to the OSP arose from gang related incidents at the Southern Ohio Correctional Facility in 1999. With essentially no evidence showing that Roe or Thompson were connected to the gang related tension, Chief Ryznar and North Regional Director Huffman nevertheless sent them to the OSP. Roe and Thompson remain at the OSP even with no evidence of current gang activity. Against this backdrop, additional procedural safeguards would, at little cost, reduce the potential of erroneous deprivation.

Next, additional procedural protections would not impair legitimate governmental interests and would place little additional administrative burden upon the state. The OSP aims to house only the most dangerous prisoners in Ohio's correctional system. Additional process advances the state's interest by consistently sending only those inmates who truly are "the worst of the worst" to the OSP. Parole Board Member Peter Davis best described the risk:

The only thing that's clear is, as I've said here, for every inmate that was cited to me and the reasons why that person was sent there, for this particular act, this assaultive behavior, if you will, we knew for a fact of plenty other inmates that were at other institutions, even close security institutions, that were not transferred [to the OSP].
(Davis Test. at 126).[25]

Requiring Department officials to give inmates specific notice of all the grounds for placing and retaining them at the OSP would cause minimal hardship. The officials would only need to expend the additional time to write out their reasons for making a specific classification decision. Furthermore, this minimal amount of additional time would increase the Department's efficiency. Accurately summarizing all the grounds supporting an inmate's placement at the OSP would assist later reviewing entities and avoid unnecessary prisoner assignments to the OSP.

In addition to ensuring that only inmates presenting a serious risk to others or to the operation of the Department are housed at the OSP, increased procedural protections will ensure that inmates that can safely be housed elsewhere at cheaper cost will not be sent to the OSP. With the exception of the Corrections Medical Center (providing inpatient hospital treatment) and the Oakwood Correctional Facility (providing inpatient psychiatric treatment), the OSP has the highest annual cost per inmate in the Ohio prison system. *See generally* Ohio Dep't of Rehab. & Corr., *The Institutions,* at http://www.drc. state.oh.us/web/prisprog.htm (last modified Feb. 5, 2002).[26] In all, any additional procedural protections at the selection and

25. Peter Davis was the executive director of the Ohio General Assembly's Correctional Institution Inspection Committee. Davis's comment is in the context of questions about his December 8, 1999, inspection report on the OSP, prepared for the Ohio General Assembly. (Pls.' Ex. 11). That report, after commenting on the subjectivity of the supermax placement process, concluded:
> Serious questions remain as to how adequate, proper, fair and objective are the decisions to identify, justify and assign selected inmates to supermax. Still needed is a "clearer, more precise understanding of the working distinctions" among decisions to assign inmates to either high maximum, or to maximum [general population], or to maximum Administrative Control or to high close security.

(Pls.' Ex. 11 at 10).

26. The OSP's higher cost is in part because it uses a higher staff-to-inmate ratio than used at other Ohio prisons. Also, unlike other prisons that have inmates prepare and serve food, inmates at the OSP do not perform any of the operational functions of the prison.

retention stages add little in administrative costs and benefit everyone by avoiding mistaken, and costly, placement at the OSP.

■ Because of the liberty interest involved resulting from the length and the conditions of confinement at the OSP, and the Court's discussion of the *Mathews* factors, the Court holds that the plaintiffs are entitled to the minimal procedural requirements announced in *Wolff*. In summary, before an inmate attends a hearing to determine if he will be reclassified to high maximum (1) the inmate is entitled to twenty-four advance written notice of all the specific evidence relied upon to support the reasons for his reclassification; (2) the inmate must be allowed to appear at the reclassification hearing and present evidence, including witnesses and documents, in support of his position;[27] and (3) the reclassification committee must issue a written statement specifically describing the evidence relied on and the reasons for its recommendation.

In listing these requirements, the Court notes that notice given to an inmate must be more than a mere formality. *See Benitez v. Wolff*, 985 F.2d 662, 665 (2d Cir. 1993). Instead, the inmate should know what he is accused of so that he can prepare a defense to those charges and not be made to explain away vague allegations. *See McKinnon v. Patterson*, 568 F.2d 930, 940 n. 11 (2d Cir.1977).

The inmate should also have the right to offer evidence and argument to the person who, in fact, makes the decision on his reclassification. Even in *Hewitt*, the prisoner was to receive "an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Hewitt*, 459 U.S. at 476, 103 S.Ct. 864. The procedural requirements the Court lists "are not elaborate, but they are real, and must be strictly complied with." *Brown*, 131 F.3d at 171.

## C. Due Process Afforded to the Plaintiffs

■ The Court now turns to the question of whether the plaintiffs were afforded the process they were due. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). A hearing is not "meaningful" if a prisoner is given inadequate information about the basis of the charges against him. *See Brown*, 131 F.3d at 172 ("If [an inmate] was not provided an accurate picture of what was at stake in the hearing, then he was not given his due process.").

The defendants did not give notice to the majority of inmates transferred to the OSP between August 1998 and October 2000. Instead, inmates were awoken in the early morning hours and shipped off to the OSP. This denial of notice was intentional, apparently because Department officials believed the transfers would be easier to make.[28] In addition, most of the

---

27. Inmates are entitled to call witnesses and have them testify at their hearing as long as doing so does not "unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566, 94 S.Ct. 2963; *King v. Wells*, 760 F.2d 89, 93 (6th Cir.1985). Prison officials choosing to exclude a witness must have a reason based on a the specific facts of the case. *See King*, 760 F.2d at 93. This requirement is meant to strike the balance identified

in *Wolff* between an inmate's due process rights and the Department's need for discretion in order to operate safely its correctional institutions.

28. Defendant Huffman served as the warden of the Southern Ohio Correctional Facility during many of the transfers. He testified:

We were concerned about security of transporting the inmates, so at that time we did

class members were never told of the grounds used to support their incarceration at the OSP. Similarly, after reviewing the reclassification committee's recommendations, Department officials frequently fail to tell inmates about the evidence used to support the denial of their reclassification to maximum security.

Inmate Roe again serves as an example. On January 20, 1999, Roe appeared for an annual review while incarcerated at the maximum security Southern Ohio Correctional Facility. While his behavior worksheet score indicated that a security level decrease was appropriate, that the reclassification committee recommended his security classification be increased from maximum to high maximum. The reclassification committee also noted that Roe had no violent conviction or infraction within the previous twenty-four months. As justification for sending Roe to the OSP, the committee stated that he was a "[l]ong standing member of the [Aryan Brotherhood]. Participated in a racial disturbance over 5 years ago." (Pls'. Ex. Roe–2 at 2). Roe was sent to the OSP even though four days after his hearing he was assaulted but did not respond with violence. In fact, there was some testimony that Roe's assault was evidence he was a gang leader because higher level gang members were being targeted at that time.

The Department's justification does not approach the necessary process to which Roe was entitled. The Department chose to move Roe to a more secure and more expensive facility without articulating a single affirmative action he had undertaken. Instead, he was allegedly moved because of longtime gang membership and his involvement in a racial incident more than five years ago. These justifications ring hollow as the Department did not transfer Roe to the OSP when it opened in

May 1998. If the Department's stated reasons made Roe an immediate threat, it seems reasonable to expect he would have been moved to the OSP shortly after it opened. Instead, the Department waited eight months. Thus, the defendants' failure to inform Roe of the reasons for his transfer or to afford Roe the opportunity to refute those reasons violated due process.

Roe faired no better in his reclassification hearings while at the OSP. Policy 111–07 recommends high maximum classification for an individual who "presents the highest level of threat to the security and order of the department and its institutions" or "functions as a leader or enforcer of a security threat group." (Pls.' Ex. 2 at 2). The defendants never gave notice to Roe of the evidence they relied on to meet Policy 111–07's requirements. After having heard evidence in a closed session, the Court finds the Department has failed to show that Roe functions as a leader or enforcer of the Aryan Brotherhood.

Inmate Thompson was similarly deprived of due process. On January 20, 1999, Thompson had a classification review. The hearing committee's worksheet indicated that Thompson had no rules violation findings, no administrative control placement, and no violence in the last five years. (Pls.' Ex. Thompson–2). At about the same time, Thompson was present at a fight in the Southern Ohio Correctional Facility involving members of rival gangs. Thompson was not brought before the rule infraction board for that incident, and the Department's confidential security threat group file on Thompson makes no mention of what role, if any, Thompson played in the fight. Nonetheless, without any notice of the evidence claimed against him, the Department sent Thompson to the OSP.

not tell them where they were going as far as the transport.

(Huffman Test. at 1138).

The Department has also failed to give Thompson notice of the evidence used to keep him at the OSP. In subsequent reclassification committee hearings, the defendants did not give any notice of specific allegations that would prevent Thompson from being reclassified. While at the OSP, Thompson received no rule infraction citations. In both 2000 and 2001, the reclassification committee recommended that Thompson's security classification be reduced, indicating that his adjustment was good, he had received no tickets, and nothing at the OSP suggested gang affiliation. (Pls.' Exs. Thompson–4, –6). However, in both 2000 and 2001, the committee's recommendations were denied because of Thompson's alleged gang membership. (Pls.' Exs. Thompson–4, –5, –6).

Thompson never had an opportunity to respond to the evidence used to keep him at the OSP because he never received notice. Having reviewed the Department's evidence against Thompson in closed session, the Court does not see any evidence indicating that Thompson is a leader or enforcer of a security threat group. Thompson was denied due process by the Department's failure to provide any reasonable notice of the evidence supporting its decision to keep him in the OSP.

Many other inmates at the OSP have not received appropriate due process. In a twelve-month period reviewed by James Austin, the defendants' expert, 369 OSP inmates had reclassification hearings. Of the 369 reviewed, the reclassification committee recommended a security level reduction for 157 inmates (43%). (Defs.' Ex. O at 9). The OSP's warden recommended eighty-eight inmates (24%) for a reduction in classification, while Chief Ryznar recommended ninety inmates (24%) for reclassification. (Defs.' Ex. O at 9). The Regional Director ultimately reclassified only seventy-one inmates (19%). (Defs.' Ex. O at 9). While a representative of the OSP's warden sits on the reclassification committee, the vast majority of inmates never had an opportunity to present evidence or argument to Chief Ryznar or the North Regional Director. Therefore, eighty-six inmates never were able to address the person responsible for making the final judgment on their retention at the OSP. Furthermore, in most cases, Chief Ryznar and the North Regional Director merely give a one- or two-sentence explanation for their decisions. Even if an inmate were able to see this explanation, such a cursory statement would not adequately inform him of evidence justifying the reviewer's decision.

▮ In sum, the Court finds that the defendants have denied the plaintiffs due process in a number of ways. First, the defendants failed to afford a large number of inmates notice and an adequate opportunity to be heard before placing them at the OSP. Second, the defendants failed to give the plaintiffs sufficient notice of the grounds serving as the basis for their retention at the OSP. Third, the defendants have failed to give the plaintiffs sufficient opportunity to understand the reasoning and evidence used to retain them at the OSP. The Court now turns to what remedy is appropriate.

### III. The Plaintiffs' Remedy

In April 1996, Congress enacted the Prison Litigation Reform Act ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996). The PLRA limits the ability of federal courts to affect the capacity and conditions of prisons beyond what is required by the Constitution and federal law. *See Hadix v. Johnson*, 228 F.3d 662, 665 (6th Cir. 2000).

Specifically, the PLRA restricts the entry of prospective relief in suits challenging the constitutionality of prison conditions, providing:

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. *The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.* The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A) (1999) (emphasis added). The term "prospective relief" is defined as "all relief other than compensatory money damages." 18 U.S.C. § 3626(g)(7) (1999). Any prospective relief ordered by the Court would terminate in two years upon the motion of either party unless the Court finds the prospective relief is needed "to correct and [sic] ongoing violation of the Federal right." 18 U.S.C. § 3626(b)(1)(A)(i).

 The defendants argue that prospective relief is unnecessary because they have adopted new policies that correct any earlier problems. On January 3, 2002, Director Wilkinson approved a new version of Policy 111–07 ("New Policy 111–07"), effective on March 1, 2002. While New Policy 111–07 improves upon the Department's placement and retention policies in major ways, the Court finds that it still fails to provide adequate due process in certain particulars.[29]

In contrast to how inmates were initially transferred to the OSP in the past, New Policy 111–07 requires an inmate be given forty-eight hour notice and an opportunity to appear before the classification committee before being sent to the OSP. (Defs.' Ex. C at 5). Inmates learn of their hearings by receipt of Form 2598, a formal Notice of Hearing. (Defs.' Ex. C at 5). However, Form 2598 does not ensure that inmates are given notice of the evidence relied upon and the specific grounds for which they are being considered for placement at the OSP. The form simply states, "[y]ou were referred to the Classification Committee for the following reason(s)" and has several blank lines to be filled in by the prison official. (Defs.' Ex. C). As currently written, nothing in New Policy 111–07 or Form 2598 requires the Department to inform an inmate of all the reasons the classification committee may recommend him for Level 5 placement.

Instead, the notice would be appropriate if the form said something like, "you are being considered for Level 5 placement at the Ohio State Penitentiary for the following reason(s)," and the classification committee then limited its consideration of Level 5 placement to the listed reasons and evidence. Such a system that ensures the inmate can adequately prepare for his hearing. He would be given notice of all grounds that could cause his reclassification.

New Policy 111–07 also fails because it is insufficiently specific regarding offenses that can lead to placement at the OSP. Under section 6(c)(4) of New Policy 111–

---

**29.** Among other things, New Policy 111–07 changed the nomenclature describing the Department's security classifications. Instead of security classifications called maximum and high maximum, New Policy 111–07 has Level 4 and Level 5, respectively. (Defs.' Ex. C at 1). Also, instead of an inmate entering the OSP at Level II and having to progress to

Level III before being able to transfer to a maximum security prison, under New Policy 111–07, an inmate enters the OSP at Privilege Level B and must progress to Privilege Level A before having the opportunity to transfer to a classification Level 4 facility. (Defs.' Ex. C at 1, 2, 6).

07, an inmate meets a Level 5 placement criteria if the "inmate has conspired or attempted to convey, introduce or possess major contraband which poses a serious threat or danger to the security of the institution. This includes but is not limited to . . . [d]rugs for distribution." (Defs.' Ex. C at 4). By failing to specify a threshold quantity, this criteria gives insufficient notice of what conduct could lead to Level 5 placement.

This lack of specificity could easily have been corrected. For example, New Policy 111–07 could define the "drugs for distribution" criteria to coincide with the drug amount required to sentence an inmate to a third degree felony.[30] Regardless of the reasonable drug quantity the Department chooses, inmates should be given specific notice of the amount.

New Policy 111–07 is also unnecessarily vague regarding the type of gang involvement that may subject an inmate to incarceration at the OSP. The current Policy 111–07 stated that an inmate prisoner could be placed at the OSP if "[t]he inmate functions as a leader or enforcer of a security threat group." (Pls.' Ex. 2 at 2). The new policy actually lessens an inmate's ability to learn what conduct is forbidden and what conduct may cause them to be placed at the OSP. Section 6(C)(5) of New Policy 111–07 says that an inmate meets a Level 5 criteria if "[t]he inmate has been identified by the institution Security Threat Group Coordinator as a leader, enforcer, or recruiter of a security threat group, which is actively involved in violent or disruptive behavior." (Defs.' Ex. C at 4).

The problem with this criteria is that it merely requires a security threat group coordinator to believe that an inmate is a leader, enforcer, or recruiter. In essence, an inmate could never adequately respond to a charge that someone had "identified" him as a member of a security threat group without knowing on what specific evidence the identification was based.

The defendants can easily correct this criteria's deficiency by requiring that the person seeking an inmate's Level 5 placement present evidence to the classification committee that the inmate is a leader, enforcer, or recruiter of a security threat group actively involved in violent or disruptive behavior. Stated another way, the Department would need to establish to the reclassification committee's satisfaction that the inmate actually was a leader, enforcer, or recruiter of a gang involved in violent or disruptive behavior. While the defendants must give an inmate sufficient notice of any gang affiliated claims the Department is relying upon to send him to the OSP, the Court recognizes that prison officials have discretion regarding sensitive information "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Wolff,* 418 U.S. at 566, 94 S.Ct. 2963.

There is one additional way New Policy 111–07 fails to provide adequate due process. Under the current policy, Chief Ryznar and the North Regional Director often make an inmate's final classification

---

**30.** The amount of cocaine required to support a third degree drug trafficking charge is as follows:

> [I]f the amount of the drug involved equals or exceeds ten grams but is less than one hundred grams of cocaine that is not crack

cocaine or equals or exceeds five grams but is less than ten grams of crack cocaine, trafficking in cocaine is a felony of the third degree . . . .

Ohio Rev.Code § 2925.03(C)(4)(d) (2001).

decision without giving him any notice of the factors that they are considering. In general, but especially in cases regarding gang affiliation, the evidence at trial showed that Chief Ryznar frequently made decisions on an inmate's classification based on evidence and arguments never disclosed to the inmate.

While an improvement over the current policy, New Policy 111–07 also fails to require that the true decision maker identify the evidence he relied upon and explain the reasoning behind his decision. Section 6(C) of the new policy states that "[t]he Bureau of Classification will review the [warden's] recommendation and any objection filed by the inmate, and make a final decision." (Defs.' Ex. C at 5). By failing to require the Bureau of Classification to issue an explanation of its decision, the new policy ignores the procedural requirement "that there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." *Wolff*, 418 U.S. at 564–65, 94 S.Ct. 2963 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).

Again, the new policy's failure to afford due process could be easily solved. *Wolff* requires the fact finder issue a written statement of the facts relied upon and the reasoning used. This written statement should address an inmate's specific case and not contain merely vague boilerplate language. If New Policy 111–07 required the Bureau of Classification to describe the specific facts found and the reasoning used to support an inmate's placement at the OSP, it would afford sufficient due process.

Besides changing the procedures for initial placement at the OSP, New Policy 111–07 changes the procedures and standards used to review an inmate's retention at the OSP. The importance of affording inmates due process at their reclassification hearings cannot be overstated. The Department transferred almost two hundred prisoners to the OSP from 1998 through early 1999 who are still at the facility and have never received an adequate hearing concerning their placement at the OSP. Reclassification under the current policy suffers from the same problems as the initial placement hearings. The reclassification committee's recommendations are often cursorily denied by someone for reasons the inmate never knew were at issue.

Under the new policy, the Department changes the procedures for reclassification reviews. One improvement is that the final decision for reclassification rests with the Bureau of Classification rather than with the North Regional Director. While New Policy 111–07 represents an improvement over current policy, it still does not afford inmates adequate due process regarding their retention at the OSP.

First, New Policy 111–07 does not call for any information to be given to the inmate prior to the hearing. The policy simply requires that the inmate be given forty-eight hours notice of his hearing and be afforded an opportunity to appear and to give information to the reclassification committee. (Defs.' Ex. C at 9). While the committee appropriately considers a completed Form 2634 [31] for each inmate, the inmates are not given the form before the reclassification committee hearing. The inmates receive no notice of the grounds claimed to support their retention at the OSP.

---

**31.** Form 2634 contains administrative information about an inmate including his time to earliest possible release, his original crime, the basis for his admission to Level 5, a summary of his conduct since admitted to Level 5, and the number of conduct reports he received since arriving at the OSP.

Second, while New Policy 111–07 has only minor deficiencies when it comes to identifying sufficiently the type of conduct that could send an inmate in the OSP, it is much worse at describing the specific conduct necessary for an inmate to leave the OSP.

> It is a fundamental precept of constitutional law, as well as "ordinary notions of fair play" that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

*Rios v. Lane,* 812 F.2d 1032, 1038 (7th Cir.1987) (quoting *Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). Adequate notice of conduct that could lead to sanctions is important if inmates are to "steer away from prohibited conduct, unentangled by the trappings of poorly delineated prison regulations." *Id.* at 1039.

The new policy provides a long list of information the reclassification committee will consider, but in the end the only standard governing the committee is "whether there has been a diminishing of the inmate's risk to the safety of persons or institutional security." (Defs.' Ex. C at 9–10). This lack of a defined standard is troubling because New Policy 111–07 also does not require the ultimate decision maker to explain why an inmate's reclassification is denied. New Policy 111–07 calls for a hearing before the reclassification committee and provides that:

> The committee shall make a recommendation to reduce or continue the inmate's security level accordingly. The committee shall identify the basis for its decision and the factors relied upon. If the committee believes the inmate presents a threat to security of a general population institution, the committee shall document their conclusions as to the inmate's risk and their reasons.

> The classification committee shall forward its recommendation to the Warden/Designee .... If the warden approves the recommendation, he or she shall submit the recommendation and the approval to the Bureau of Classification for final disposition .... The Bureau of Classification will review the recommendation and any objections filed by the inmate, and make a decision.

(Defs.' Ex. C at 10).

Just as with the initial placement hearings, New Policy 111–07 vests final authority with the Bureau of Classification. Under the current policy, Chief Ryznar denied the reclassification committee's recommendation for a reduced classification in nearly half of the cases he saw. The evidence presented at trial, especially in Roe's and Thompson's cases, raises questions about the adequacy of the justifications Chief Ryznar used to make his decisions. Still, under the new policy, the Bureau of Classification would still not be required to give any explanation for denying an inmate reclassification. Once again, the new policy ignores the procedural requirement "that there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." *Wolff,* 418 U.S. at 564–65, 94 S.Ct. 2963 (quoting *Morrissey,* 408 U.S. at 489, 92 S.Ct. 2593).

As before, the new policy's due process deficiency is easily correctable. In reviewing both placement and reclassification decisions, the Bureau of Classification should set out the evidence it relied upon and the reasons for its decision. This information should be set out in sufficient detail to show the inmates the evidence that was actually considered and that a reasoned judgment was made. The use of boilerplate language and form decisions does not

show a reasoned consideration of the facts of the case necessary to afford an inmate due process.

### IV. Conclusion

As described, the Court finds that the plaintiff inmates have a liberty interest entitled to constitutional protection. Because of the length of placement in its severely restrictive conditions, incarceration at the OSP imposes an atypical and a significant hardship upon inmates. The defendants have violated the plaintiff class's right to due process by denying the plaintiffs adequate notice, adequate hearing, and sufficiently detailed decisions.

Having found that the defendants violated, and will continue to violate, the plaintiffs' constitutionally protected liberty interest, the Court orders the parties to file, within fourteen days of the publication of this judgment, proposed injunctive orders, extending no further than necessary to correct the violation of the federal right set out in this opinion in a way that is the least intrusive means to correct the violation.

IT IS SO ORDERED.