WYNN, Circuit Judge:
*353 Defendants Harold W. Clarke, in his official capacity as director of the Virginia Department of Corrections, and David Zook, in his official capacity as warden of Virginia's Sussex I State Prison (collectively, "State Defendants"), appeal a decision by the U.S. District Court for the Eastern District of Virginia holding that conditions of confinement on Virginia's death row violated the Eighth Amendment and enjoining reinstatement of those conditions. The district court held that the death row inmates' long-term detention in conditions amounting to solitary confinement created a "substantial risk" of psychological and emotional harm and that State Defendants were "deliberately indifferent" to that risk. See Porter v. Clarke , 290 F.Supp.3d 518, 530-33 (E.D. Va. 2018). For the reasons that follow, we affirm.
I.
Plaintiffs Thomas Porter, Anthony Juniper, and Mark Lawlor (collectively, "Plaintiffs") are housed on Virginia's death row at Sussex I State Prison ("Sussex Prison"). Death row consists of two tiers, with each tier holding twenty-two cells and three showers. Porter , 290 F.Supp.3d at 522. Each death row inmate is housed in a separate cell, and no inmates are housed in adjacent cells. Each cell is 71 square feet-approximately one-half the size of a parking space-and has a 10.5-foot-high ceiling. Cells contain a bed, a small desk adjacent to the bed, and a commode/sink combination. Each cell has a window that is 5 inches high by 41.5 inches long, which is covered by a wire mesh that allows natural light to pass through into the cell. Each cell's door is made of solid steel, includes a tray slot that is bolted shut when not in use, and a "rectangular in-set window that allow[s] inmates to look outside their cell into the pod." Id. at 523.
In November 2014-when Plaintiffs filed this lawsuit-two documents governed Plaintiffs' conditions of confinement on death row: Virginia Department of Corrections ("Corrections Department") Operating Procedure 460A, effective March 2010, and the Sussex Prison Institutional Rules and Regulations for Offenders, effective February 2010. These procedures and regulations allowed death row inmates one hour of outdoor recreation five days a week, and a ten-minute shower three days a week. During their outdoor recreation, inmates were confined to individual enclosures with concrete floors and enclosed by a steel and wire mesh cage. Each enclosure measured 7.9 feet wide by 20 feet long-approximately the size of a parking space-and 10 feet high. Id. None of the enclosures had exercise equipment. Inmates could not simultaneously use adjacent recreation enclosures.
Under the governing procedures and regulations, cells on death row were always *354 lit: during the day, cells were illuminated by a main light mounted on the wall, and at night a low-level night light provided illumination for security and safety purposes. Inmates housed on death row could keep a television and compact disc player in their cell and borrow approved publications and library materials to read. Additionally, inmates could request and use wireless telephones any day of the week between 8:00 a.m. and 9:30 p.m.
The governing regulations and procedures allowed death row inmates to have noncontact visitation on weekends and state holidays. Inmates also could request contact visitation with immediate family members in "extreme circumstances" once every six months, which request the warden had unconstrained discretion to grant or deny. J.A. 997. In practice, the warden would grant a request for contact visitation only when an inmate was approaching "death." J.A. 997. Additionally, inmates had limited contact with prison staff. Corrections officers made rounds through the death row pod to perform security checks on inmates every thirty minutes and could-and sometimes would-speak with inmates to see if they needed assistance or had requests. Medical personnel and nurses also made rounds through the pod twice a day to provide inmates with medication. And death row inmates received visits from a mental-health practitioner at least once a week, and case counselors made rounds through the pod once a day.
Two inmates housed on death row, Plaintiff Porter and former Plaintiff Ricky Gray,[1] were allowed out of their cells to perform institutional jobs. "Other than these limited out-of-cell interactions, death row inmates were generally not permitted to leave their cells." Porter , 290 F.Supp.3d at 523. "In particular, they were denied access to any form of congregate recreation, either indoor or outdoor; they were not allowed to eat meals outside of their cells; and they could not participate in congregate religious services or prison programming." Id. Due to these restrictions, death row inmates spent between 23 and 24 hours per day in their cells. Id. at 528.
In November 2014, Plaintiffs filed suit against Clarke, in his official capacity as director of the Corrections Department, and Keith Davis, who, at that time, served as warden of Sussex Prison. Plaintiffs alleged that the then-existing conditions of confinement on Virginia's death row violated the Eighth Amendment and sought injunctive and declaratory relief.
On February 21, 2018, the district court awarded summary judgment in Plaintiffs' favor on their Eighth Amendment claim. Porter , 290 F.Supp.3d at 533. In reaching that conclusion, the district court held that, under the undisputed evidence, the conditions of confinement on Virginia's death row-particularly inmates' prolonged periods of isolation-"created, at the least, a significant risk of substantial psychological or emotional harm." Id. at 532. The district court further held that, under the undisputed evidence, that State Defendants were "deliberate[ly] indifferen[t]" to that risk of harm. Id. at 533. The district court awarded Plaintiffs injunctive and declaratory relief, concluding that such relief was available under the Prison Litigation Reform Act ("PLRA") and was necessary because there "exist[ed] some cognizable danger of recurrent violation." Id. at 534-42 (quoting United States v. W.T. Grant Co. , 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) ). State Defendants timely appealed.
II.
On appeal, State Defendants argue that the district court erred (A) in awarding *355 summary judgment to Plaintiffs on their Eighth Amendment claim and (B) in awarding Plaintiffs injunctive relief. We address each argument in turn.
A.
At the outset, State Defendants argue that the district court erred in awarding Plaintiffs summary judgment on their Eighth Amendment conditions of confinement claim. Summary judgment is proper when there are no material disputes of fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This Court reviews de novo a district court's award of summary judgment. United States v. Ancient Coin Collectors Guild , 899 F.3d 295, 312 (4th Cir. 2018).
The Eighth Amendment, which prohibits infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, applies to claims by prisoners against corrections officials challenging conditions of confinement. See Scinto v. Stansberry , 841 F.3d 219, 225 (4th Cir. 2016) ("[T]he Eighth Amendment imposes a duty on prison officials to 'provide humane conditions of confinement ... [and] ensure that inmates receive adequate food, clothing, shelter, and medical care." (quoting Farmer v. Brennan , 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) )); Williams v. Benjamin , 77 F.3d 756, 761 (4th Cir. 1996). Whether an inmate's conditions of confinement amount to "cruel and unusual punishment" must be measured against "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble , 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting Trop v. Dulles , 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) ). Like any other Eighth Amendment claim, an Eighth Amendment conditions of confinement claim has (1) "objective" and (2) "subjective" components. Scinto , 841 F.3d at 225 (citing Farmer , 511 U.S. at 834, 114 S.Ct. 1970 ).
1.
To satisfy the "objective" prong, a plaintiff inmate must "demonstrate that 'the deprivation alleged [was], objectively, sufficiently serious.' " Id. at 225. (quoting Farmer , 511 U.S. at 834, 114 S.Ct. 1970 ). "To be 'sufficiently serious,' the deprivation must be 'extreme'-meaning that it poses a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of serious harm resulting from ... exposure to the challenged conditions.' " Id. (quoting De'Lonta v. Angelone , 330 F.3d 630, 634 (4th Cir. 2003) ).
More than a century ago, the Supreme Court recognized the adverse consequences to inmates' mental health posed by prolonged detention in conditions akin to solitary confinement. According to the Court, "experience demonstrated" that, when placed in isolation, "[a] considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." In re Medley , 134 U.S. 160, 168, 10 S.Ct. 384, 33 L.Ed. 835 (1890).
In recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions materially indistinguishable from the challenged conditions on Virginia's death row. For *356 example, a report submitted by one of Plaintiffs' experts in clinical and forensic psychology, Dr. Mark Cunningham, notes "that the associated adverse psychological reactions to solitary confinement detailed in th[e] literature include psychotic-spectrum symptoms of paranoia and hallucinations; mood-spectrum symptoms of depression, withdrawal, appetite and sleep disturbance, fatigue and lethargy, and suicidal ideation ; anxiety spectrum symptoms of subjective distress, feelings of impending doom, somatic complaints, dissociative experience, and ruminative thoughts; affective lability characterized by irritability, rage, and aggressive impulses; and behavioral self-control symptoms of aggression, assaults, and self-mutilation." J.A. 1041.
Numerous studies reveal that prolonged detention of inmates in conditions akin to those Plaintiffs faced on Virginia's death row also leads to "psychological deterioration," including " 'declines in mental functioning,' " " 'difficulties in thinking, concentration and memory problems, and problems with impulse control.' " J.A. 1042 (quoting Jesenia Pizarro & Vanja M. K. Stenius, Supermax Prisons: Their Rise, Current Practices, and Effect on Inmates , 84 Prison J. 248, 256 (2004)). Similarly, another expert in forensic and clinical psychology retained by Plaintiffs, Dr. Michael Hendricks, reports that "common adverse psychological effects of isolation housing in prison and jail settings (i.e., typically found to have been experienced by at least half of inmates in these settings) include anxiety, headaches and other psychosomatic symptoms, lethargy, insomnia, decreased appetite, and nightmares." J.A. 925.
Notwithstanding that scholars have conducted dozens of studies on the psychological and emotional effects of solitary and segregated confinement, the leading survey of the literature regarding such confinement found that "there is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasted for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects ." J.A. 1041 (emphases added) (quoting Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement , 49 Crime & Delinquency 124, 132 (2003)). Based on this extensive body of literature, scholars have concluded that "solitary confinement has potentially serious psychiatric risks." J.A. 1042 (quoting Pizarro & Stenius, supra at 256); see also Br. Amici Curiae Profs. & Practitioners of Psychiatry & Psychology in Supp. of Pls.-Apps. and Affirmance ("Amici Br.") at 8-9 ("Scientific research, regardless of methodology, has produced strikingly consistent results: the deprivation of meaningful social contact and positive environmental stimulation characteristic of solitary confinement subjects prisoners to grave psychological and physiological harms." (internal quotation marks omitted)). Notably, State Defendants adduced no evidence refuting Plaintiffs' expert evidence establishing the risks and serious adverse psychological and emotional effects of prolonged solitary confinement, or the surveys of the scholarly literature supporting that evidence.
Courts have taken note of this extensive-and growing-body of literature. In recent years, Justice Kennedy and Justice Breyer authored separate opinions highlighting the serious psychological and emotional harm caused by segregated or solitary confinement under conditions materially indistinguishable from those that existed on Virginia's death row. See Ruiz v. Texas , --- U.S. ----, 137 S.Ct. 1246, 1247, 197 L.Ed.2d 487 (2017) (Breyer, J., dissenting from denial of stay of execution) (stating that evidence demonstrated *357 that the petitioner, an inmate held on Texas's death row, "ha[d] developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); Glossip v. Gross , --- U.S. ----, 135 S.Ct. 2726, 2765, 192 L.Ed.2d 761 (2015) (Breyer, J., dissenting) (reviewing literature and stating that "it is well documented that ... prolonged solitary confinement produces numerous deleterious harms"); Davis v. Ayala , --- U.S. ----, 135 S.Ct. 2187, 2210, 192 L.Ed.2d 323 (2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price.").
Likewise, this Court stated that "[p]rolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." Incumaa v. Stirling , 791 F.3d 517, 534 (4th Cir. 2015). And the Third Circuit recently reviewed the "robust body of scientific research on the effects of solitary confinement" and found a "scientific consensus" that such confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term ... damage." Williams v. Sec'y Penn. Dep't of Corr. , 848 F.3d 549, 566-67 (3d Cir. 2017), cert denied sub nom. Walker v. Farnan , --- U.S. ----, 138 S.Ct. 357, 199 L.Ed.2d 263 (2017), and cert denied sub nom. Williams v. Wetzel , --- U.S. ----, 138 S.Ct. 357, 199 L.Ed.2d 263 (2017) ; see also, e.g. , Grissom v. Roberts , 902 F.3d 1162, 1176-77 (10th Cir. 2018) (Lucero, J., concurring) (reviewing academic literature and determining that "solitary confinement, even over relatively short periods, renders prisoners physically sick and mentally ill. ... These harms, which are persistent and may become permanent, become more severe the longer a person is exposed to solitary confinement.").
Of particular relevance, several courts have found-based on the empirical evidence set forth above-that solitary confinement poses an objective risk of serious psychological and emotional harm to inmates, and therefore can violate the Eighth Amendment. See, e.g. , Palakovic v. Wetzel , 854 F.3d 209, 225-26 (3d Cir. 2017) ("acknowledg[ing] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement"); Ashker v. Brown , No. C 09-5796, 2013 WL 1435148, at *4-5 (N.D. Cal. Apr. 9, 2013) ; Wilkerson v. Stalder , 639 F.Supp.2d 654, 678-79 (M.D. La. 2007) ("It is obvious that being housed in isolation in a tiny cell for 23 hours a day for over three decades results in serious deprivations of basic human needs."); McClary v. Kelly , 4 F.Supp.2d 195, 208 (W.D.N.Y. 1998) ("[T]hat prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science.").
We agree. The challenged conditions of confinement on Virginia's death row-under which Plaintiffs spent, for years, between 23 and 24 hours a day "alone, in a small ... cell" with "no access to congregate religious, educational, or social programming"-pose a "substantial risk" of serious psychological and emotional harm. Porter , 290 F.Supp.3d at 527-28.
State Defendants nevertheless argue that the district court erred in holding that the undisputed evidence satisfied Plaintiffs' burden under the objective prong for three reasons: (1) this Court previously has found that the placement of inmates in conditions of confinement as or more isolating than those faced by Plaintiffs did *358 not pose an objective risk of serious harm; (2) Plaintiffs were not, as a matter of fact, held in "solitary" confinement; and (3) Plaintiffs' "generalized" evidence of the risks posed by solitary confinement does not establish that Plaintiffs, in particular, experienced such harms. Appellants' Br. at 43-48.
First, State Defendants maintain-and our colleague in dissent agrees-that the district court erred because this Court's decisions in Sweet v. South Carolina Department of Correction , 529 F.2d 854 (4th Cir. 1975) (en banc), and Mickle v. Moore , 174 F.3d 464 (4th Cir. 1999), upheld conditions of confinement that are "squarely analogous" to the challenged conditions on Virginia's death row. Appellants' Br. at 44. In Sweet , this Court stated that " 'isolation from companionship,' 'restriction on intellectual stimulation and prolonged inactivity,' inescapable accompaniments of segregated confinement, will not render segregated confinement unconstitutional absent other illegitimate deprivations. Nor will the fact that the segregated confinement is prolonged and indefinite be sufficient in itself to command constitutional protection, though it is a factor to be considered." 529 F.2d at 861. But Sweet significantly predated all the Supreme Court's conditions of confinement decisions-including Rhodes v. Chapman , 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), which first set forth the standard for satisfying the objective component of a conditions of confinement claim-and lacked the benefit of the recent academic literature surveyed by Plaintiffs' experts concerning the harmful psychological and emotional effects of prolonged solitary confinement. Because Sweet was decided under a different legal standard, we agree with the district court that Sweet cannot-does not-control this case.
Mickle involved an Eighth Amendment challenge by members of the "Five Percenters" gang who the South Carolina Department of Correction transferred to "long-term segregated confinement" after a series of violent incidents perpetrated by incarcerated members of the gang. 174 F.3d at 466-67, 471. Under the terms of their segregated confinement, the gang members were "confined to their cells for twenty-three hours per day without radio or television," received "only five hours of exercise per week," and could not "participate in prison work, school, or study programs." Id. at 471. Citing Sweet , Mickle held that the Five Percenters failed to show that their conditions of confinement amounted to "a serious deprivation of a basic human need" because "the isolation inherent in administrative segregation or maximum custody is not itself constitutionally objectionable." Id. at 472. This Court also rejected the Five Percenters' claim that the indefinite duration of their confinement in segregation rendered it unconstitutional, emphasizing that the Five Percenters failed to demonstrate that they had suffered a serious mental illness or psychological injury. Id. (further stating that the Five Percenters' subjective claims of anxiety and depression were insufficient).
Like Sweet , we do not believe Mickle controls this case. To begin, Plaintiffs introduced two expert reports derived from surveying dozens of empirical analyses as well as observations of the challenged conditions on Virginia's death row. Those reports demonstrated the serious psychological and emotional risks posed by conditions of confinement materially indistinguishable from those Plaintiffs' faced on Virginia's death row. Significantly, much of that research post-dates Mickle . See J.A. 924 (Hendricks report) ("[T]he research, particularly as it relates to special housing units in jails and prisons, has advanced *359 greatly in the last 15 years, furthering the scientific understanding of the harmful effects of solitary confinement and social isolation in these facilities"); J.A. 1041 (Cunningham report) (listing key studies of the adverse impact of solitary and segregated confinement post-dating Mickle ). By contrast, the Mickle plaintiffs did not introduce any expert reports or analyses concerning the risks of serious psychological and emotional harms attributable to long-term solitary confinement. Mickle , 174 F.3d at 472. Put simply, unlike Plaintiffs, the Mickle plaintiffs failed to establish an evidentiary record that would have allowed this Court to find that prolonged solitary confinement poses a serious risk of psychological and emotional harm.
Equally significant, the Five Percenters were placed in segregation based on their in-prison conduct and were removed from segregation if they renounced their membership with the group. Id. at 466-67. By contrast, the challenged Virginia procedures and regulations place death row inmates in solitary confinement based on their sentence alone and do not provide death row inmates with an avenue for removing themselves from segregation. Because Mickle involved a different set of facts than those adduced by Plaintiffs, our decision cannot-and does not-overrule Mickle . See United States v. Floresca , 38 F.3d 706, 711 (4th Cir. 1994) ("Because Bledsoe is on different facts than the instant case, ... Bledsoe does not control our holding in this case."); Cal. v. Anglim , 129 F.2d 455, 460 (9th Cir. 1942) (explaining that a later decision "does not overrule" an earlier decision when "[e]ach decision rests on different facts").
Second, State Defendants argue that Plaintiffs were not, as a matter of fact, held in "solitary" confinement. In particular, State Defendants argue that Plaintiffs were not placed in the type of "solitary" confinement that the experts warned about because Plaintiffs were not "subject to 'prolonged isolation' or 'lack of stimulation.' " Appellants' Br. at 44. The undisputed facts belie that contention.
State Defendants do not dispute-nor could they-that the challenged procedures and regulations restricted death row inmates to their cells for between 23 and 24 hours a day. State Defendants also do not dispute that the challenged procedures and regulations denied death row inmates the opportunity for any form of congregate programming, recreation, or religious practice. And State Defendants do not dispute that, at the time they filed this case, Plaintiffs already had been housed in such isolated confinement for years. Dr. Hendricks' unrebutted report avers that these and other challenged conditions on Virginia's death row "hew closely to the sensory deprivation described in the studies in the research literature" finding and quantifying the adverse psychological and emotional effects associated with prolonged confinement in such conditions. J.A. 926-27. Accordingly, under the undisputed facts, the scholarly articles regarding the consequences of prolonged solitary confinement relied on by Plaintiffs' experts bear directly on the risks attributable to the challenged conditions of confinement on Virginia's death row.
Additionally, in Wilkinson v. Austin , 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005), the Supreme Court characterized Ohio's "administrative control" unit as "a highly restrictive form of solitary confinement," id. at 214, 125 S.Ct. 2384 (citing Austin v. Wilkinson , 189 F.Supp.2d 719, 724-25 & n.5 (N.D. Ohio 2002) ). Notably, the conditions of confinement for Ohio inmates housed in administrative control were materially less isolating than those faced by Plaintiffs on Virginia's death row. Whereas Virginia's *360 death row inmates were housed in non-adjacent cells with solid steel doors-which, former Sussex Prison warden Davis concedes, pose a significant "imped[iment]," if not absolute barrier, to communication, J.A. 975-Ohio inmates housed in administrative control lived in "open-faced cells" or "cells with bars, not solid doors," allowing inmates to "easily communicate," Austin , 189 F.Supp.2d at 725-26. Whereas inmates on Virginia's death row were entitled to outdoor exercise only five days a week, Ohio inmates housed in administrative control "ha[d] outside recreation available every day." Id. at 725. Whereas Virginia denied death row inmates access to exercise equipment, Ohio inmates in administrative control had "access to basketball courts and work-out areas." Id. And whereas the challenged procedures and regulations denied Virginia death row inmates access to congregate programming, Ohio allowed even those inmates housed in conditions more restrictive than administrative control to engage in some congregate activities, such as counseling. Id. at 725. Accordingly, under governing law, the challenged conditions on Virginia's death row amount to, at a minimum, "a highly restrictive form of solitary confinement." Wilkinson , 545 U.S. at 214, 125 S.Ct. 2384.
The Supreme Court's determination that Ohio's administrative control unit constituted "a highly restrictive form of solitary confinement" also refutes State Defendants' contention that Plaintiffs' visits from or access to corrections officials and health professionals distinguished the challenged conditions of confinement from those that scholars and courts have found pose a substantial risk of serious psychological and emotional harm. Appellants' Br. at 42-43. Put simply, if the ability to "easily communicate" with fellow inmates and engage in congregate programming did not prevent the Supreme Court from characterizing Ohio's administrative control unit as a "highly restrictive form of solitary confinement," then the limited contacts Virginia's death row inmates had with prison officials and health professionals do not render the challenged conditions of confinement meaningfully less restrictive or isolating from a legal or factual perspective.
Third, State Defendants argue that Plaintiffs' "generalized" evidence of the harms posed by solitary confinement cannot be used to establish that these Plaintiffs were, in fact, harmed by the challenged conditions on Virginia's death row. State Defendants point out that their expert in psychiatry, Dr. Gregory B. Saathoff, evaluated most of the Plaintiffs and opined that none of them exhibited cognitive "instability or deterioration," and that "symptoms of anxiety, depression, insomnia and associated symptoms reported by [Plaintiffs] are not unlike those that are exhibited by the general population offenders serving life sentences." J.A. 193. By contrast, Plaintiffs' expert, Dr. Hendricks, diagnosed Plaintiffs with several psychological and emotional conditions, which he opined were attributable to Plaintiffs' conditions of confinement. Based on this conflicting evidence, the district court recognized that there is a dispute of fact as to whether Plaintiffs have, in fact, been harmed by their conditions of confinement. Porter , 290 F.Supp.3d at 530-31.
But, as the district court held, that dispute of fact did not preclude a determination that the undisputed evidence established that Plaintiffs faced a "substantial risk" of serious harm from their conditions of confinement. Id. at 531. In particular, State Defendants never have offered evidence disputing the numerous studies and scholarly articles surveyed by Dr. Cunningham *361 and Dr. Hendricks demonstrating that prolonged isolated confinement, under conditions closely analogous to those Plaintiffs challenge, creates a substantial risk of psychological and emotional harm, which risk is sufficient to satisfy the objective prong. J.A. 924-27; 1041-42. Accordingly, the district court correctly held that, under the undisputed facts, the challenged conditions of confinement on Virginia's death row created a "substantial risk" of serious psychological and emotional harm.
2.
To satisfy the "subjective" prong in an Eighth Amendment case, a plaintiff challenging his conditions of confinement must demonstrate that prison officials acted with "deliberate indifference." Scinto , 841 F.3d at 225. "To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.' " Id. (quoting Farmer , 511 U.S. at 837, 114 S.Ct. 1970 ). "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.' " Id. (quoting Farmer , 511 U.S. at 835, 114 S.Ct. 1970 ). A plaintiff may satisfy this standard by "prov[ing] by circumstantial evidence that a risk was so obvious that it had to have been known." Makdessi v. Fields , 789 F.3d 126, 136 (4th Cir. 2015). Put differently, "[a]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate." Schaub v. VonWald , 638 F.3d 905, 915 (8th Cir. 2011).
Here, several undisputed facts established State Defendants' deliberate indifference. To begin, Plaintiffs' evidence established that State Defendants, in fact, were aware of the substantial risk of psychological or emotional harm posed by solitary confinement. Former defendant Davis, who served as warden of Sussex Prison until he was replaced by Zook in March 2016, testified in June 2013-more than a year before Plaintiffs filed the instant case-that "being separated and alone from human contact, that we-as humans, we don't survive very well that way with lack of human contact." J.A. 972. And in that same case-in which defendant Clarke also was a named defendant-a November 2013 opinion issued by the district court characterized the challenged conditions of Virginia's death row as "dehumanizing." Prieto v. Clarke , No. 1:12-cv-1199, 2013 WL 6019215, at *6 (E.D. Va. Nov. 12, 2013), rev'd on other grounds , 780 F.3d 245, 254-55 (4th Cir. 2015). Likewise, Corrections Department procedures barring detention of non-death row prisoners in segregated confinement-akin to the challenged conditions on death row-for longer than thirty consecutive days constitute unrebutted evidence of State Defendants' awareness "that extended stays in segregation can have harmful emotional and psychological effects." Porter , 290 F.Supp.3d at 532. Notwithstanding this awareness, State Defendants elected not to revisit the challenged conditions until after Plaintiffs filed suit.
Additionally, the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm "was so obvious that it had to have been known." Makdessi , 789 F.3d at 136. As the district court correctly pointed out, "[g]iven [State D]efendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction on death row could cause." Porter , 290 F.Supp.3d at 532.
*362 In determining that the undisputed evidence established State Defendants' deliberate indifference, the district court disregarded State Defendants' argument "that the policies were justified by legitimate security risks" and therefore had a "legitimate penological objective." Id. at 532-33 & n.14. Although the court recognized that the question of "whether these conditions had a legitimate penological objective ... would not be amenable to resolution at the summary judgment stage" because the parties presented conflicting evidence, the court said resolution of that question was "unnecessary ... given the variety of other evidence that defendants knew of the potentially harmful effects of the pre-2015 conditions." Id. at 533 n.14. Put differently, the district court concluded that it need not consider penological justification if independent evidence established that State Defendants acted with deliberate indifference.
We believe that the district court erred in failing to consider State Defendants' penological justification for housing death row inmates in conditions amounting to solitary confinement. Both the Supreme Court and this Court have recognized that the penological justification supporting a challenged condition is relevant in a conditions of confinement case. See Rhodes , 452 U.S. at 346, 101 S.Ct. 2392 ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.' "); see also Lopez v. Robinson , 914 F.2d 486, 490 (4th Cir. 1990) ("Prison conditions are unconstitutional if they constitute an 'unnecessary and wanton' infliction of pain and are 'totally without penological justification.' "). To be sure, the exact role of penological justification in analyzing an Eighth Amendment conditions of confinement case is unsettled. See Grenning v. Miller-Stout , 739 F.3d 1235, 1240 (9th Cir. 2014) (stating that "[t]he precise role of legitimate penological interests is not entirely clear in the context of an Eighth Amendment challenge to conditions of confinement," but noting that "[t]he existence of a legitimate penological justification has, however, been used in considering whether adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes").
Perhaps the clearest way penological justification factors into "conditions of confinement cases" is through the subjective prong inquiry because, in a typical Eighth Amendment case, "[w]here there is no legitimate penological purpose for a prison official's conduct, courts have 'presum[ed] malicious and sadistic intent.' " Wood v. Beauclair , 692 F.3d 1041, 1050 (9th Cir. 2012) (quoting Giron v. Corr. Corp. of Am. , 191 F.3d 1281, 1290 (10th Cir. 1999) ); see also, e.g. , Ricks v. Shover , 891 F.3d 468, 475 (3d Cir. 2018). Put differently, if a prison official lacks a legitimate penological justification for subjecting an inmate to a condition of confinement that poses a substantial risk of serious harm-like prolonged solitary confinement, see supra Part II.A.1-then the official is presumptively acting with deliberate indifference to that risk. But some opinions also treat penological justification as a component of the objective prong analysis. See, e.g. , Thomas v. Bryant , 614 F.3d 1288, 1311 (11th Cir. 2010) ; Foster v. Runnels , 554 F.3d 807, 814 (9th Cir. 2009). And still others appear to treat it as a separate inquiry. See Rice ex rel. Rice v. Corr. Medical Svcs. , 675 F.3d 650, 666 (7th Cir. 2012).
Notwithstanding the uncertain role of penological justification in conditions of confinement cases, we believe-contrary to the district court's opinion-that a legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement, *363 similar to the challenged conditions on Virginia's death row, even though such conditions create an objective risk of serious emotional and psychological harm. Put simply, prison officials tasked with the difficult task of operating a detention center may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective.[2] Cf. Florence v. Bd. of Chosen Freeholders of Cty. of Burlington , 566 U.S. 318, 326, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012) ("The difficulties of operating a detention center must not be underestimated by the courts.").
We are not alone in this conclusion. For example, in Bass v. Perrin , 170 F.3d 1312 (11th Cir. 1999), the Eleventh Circuit held that the placement of two prisoners in segregation without access to outdoor recreation did not violate the Eighth Amendment because the prisoners had engaged in violent crimes while incarcerated, id. at 1316. "The pain inflicted on the plaintiffs, however, cannot be said to be unnecessary-in other words, 'totally without penological justification,' " the court explained. Id. Likewise, the Seventh Circuit has held that "prolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment ..., depending on the duration and nature of the segregation and whether there were feasible alternatives to that confinement ." Rice , 675 F.3d at 666 (emphasis added); see also Grissom , 902 F.3d at 1178 (Lucero, J., concurring) (explaining, in a case challenging a prisoner's prolonged placement in segregation, that "[a]t base, then, the question is whether the extreme nature of [the prisoner's] confinement is justified by legitimate penological interests").
Although we find that the district court erred in disregarding State Defendants' argument that legitimate penological considerations justified the challenged conditions on Virginia's death row, this error does not constitute a basis for vacating the district court's award of summary judgment. State Defendants elected not to argue in their briefing to this Court that the district court erred in disregarding their previously asserted penological justifications. Perhaps State Defendants abandoned their penological justification argument on appeal because Plaintiffs presented unrebutted empirical evidence that, as a group, "[d]eath-sentenced inmates do not have disproportionate rates of serious violence when confined under general population security conditions." J.A. 1028-36 (Cunningham report). Or perhaps, State Defendants elected not to pursue their penological justification argument because Virginia has not experienced, to date, any notable security incidents since it relaxed the challenged conditions on death row during the pendency of this litigation. See infra Part III.B.1. Regardless, we must respect that decision-strategic or otherwise-and therefore treat the issue as waived. See United States v. Washington , 743 F.3d 938, 941 n.1 (4th Cir. 2014) ("Issues *364 that [the appellant] failed to raise in his opening brief are waived.").
* * * * *
In sum, the undisputed evidence established both that the challenged conditions of confinement on Virginia's death row created a substantial risk of serious psychological and emotional harm and that State Defendants were deliberately indifferent to that risk. Accordingly, the district court properly awarded summary judgment in Plaintiffs' favor on their Eighth Amendment claim.
B.
State Defendants further argue that the district court reversibly erred in awarding Plaintiffs injunctive relief. We review a district court's decision to award "equitable relief for abuse of discretion, accepting the court's factual findings absent clear error, while examining issues of law de novo." Dixon v. Edwards , 290 F.3d 699, 710 (4th Cir. 2002). Additionally, the Supreme Court has emphasized that a district court's authority to award and fashion equitable relief is "necessarily broad and a strong showing of abuse must be made to reverse it." W.T. Grant , 345 U.S. at 633, 73 S.Ct. 894.
Here, State Defendants contend that Plaintiffs were not entitled to injunctive relief because: (1) post-filing changes to the challenged conditions on Virginia's death row barred the award of equitable relief and (2) the PLRA permits district courts to impose injunctive or declaratory relief only if there is an "ongoing constitutional violation." Appellants' Br. at 25.
1.
State Defendants first argue-and our colleague in dissent agrees-that the district court abused its discretion in awarding Plaintiffs injunctive relief "because the conditions that they brought suit to challenge no longer exist and because there is no realistic possibility of their reoccurrence." Appellants' Br. at 33-34.
On August 6, 2015-almost a year after Plaintiffs filed this action-the Corrections Department adopted revised procedures and regulations that provide death row inmates with several new privileges, including: (1) having "contact visitation with immediate family members one day per week for one and a half hours at a time"; (2) having "non-contact visitation on weekends and holidays with immediate family members and one approved non-family member"; (3) participating in in-pod recreation with a maximum of three other offenders seven days per week for a minimum of one hour per day; (4) participating in outdoor recreation five days per week for 90 minutes per day; and (5) showering seven days per week, for up to fifteen minutes. Porter , 290 F.Supp.3d at 524. The in-pod, congregate recreation "occur[s] in a newly screened off area of the death row pod that contain[s] a television, two tables with seating, a bench, various games, and a JPAY kiosk that enable[s] inmates to download music, purchase books and movies, and send e-mails." Id. The Corrections Department also constructed "a covered outdoor recreation yard that ... include[s] two sections, each equipped with a basketball court and stationary exercise equipment, in which groups of up to four death row inmates could congregate." Id. Plaintiffs concede that the relaxed conditions of confinement do not violate the Eighth Amendment.
State Defendants contend, correctly, that when a defendant discontinues illegal conduct, a party seeking injunctive relief must demonstrate that such relief is "needed," meaning that "there exists some cognizable danger of recurrent violation, something more than the mere possibility *365 which serves to keep the case alive." See W.T. Grant , 345 U.S. at 633, 73 S.Ct. 894. That being said, "[c]ourts require 'clear proof' that an unlawful practice has been abandoned, and must guard against attempts to avoid injunctive relief 'by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption.' " Wilk v. Am. Med. Ass'n , 895 F.2d 352, 367 (7th Cir 1990) (quoting United States v. Oregon State Med. Soc'y , 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952) ). According to State Defendants, there is no "cognizable danger of recurrent violation" because "corrections officials have testified under oath that they have no intention of reverting to the prior conditions, and that testimony is ... undisputed." Appellant's Br. at 24.
Notwithstanding State Defendants' averred lack of present intent to revert to the challenged conditions, the district court found, as a matter of fact, that Plaintiffs satisfied their burden to demonstrate a "cognizable danger of recurrent violence." Porter , 290 F.Supp.3d at 539-40 (emphasis added). In support of that determination, the district court first found that State Defendants' "change from the pre-2015 conditions of confinement to the current conditions was influenced, although not entirely dependent on, the current litigation." Id. at 540. The district court further found that "there is no legal barrier to defendants returning to the pre-2015 conditions nor is there any pre-implementation mechanism for plaintiffs to challenge such a return." Id. And the district court found "most persuasive" that "although defendants individually state they do not currently intend to return to the pre-2015 conditions, they have declined to commit [the Corrections Department] to this nonreversion promise," despite being offered several opportunities to do so, including in earlier proceedings before this Court. Id. at 524-25, 540 (emphasis added); see also Porter v. Clarke , 852 F.3d 358, 365 (4th Cir. 2017) (noting that "during oral argument, [State] Defendants' counsel said the Corrections Department could not foreswear a return to the challenged policies"). Additionally, State Defendants have repeatedly reaffirmed-including in their briefing to this Court-that they do not believe the challenged conditions violate the Eighth Amendment.
The record supports each of the district court's specific findings. And the district court's ultimate factual finding of a "cognizable danger of recurrent violation" constitutes a reasonable inference from these well-supported facts and is therefore not subject to reversal under the applicable clear error standard of review. See Baxter v. Comm'r of I.R.S. , 910 F.3d 150, 166-67 (4th Cir. 2018). Likewise, our sister circuits have relied on similar facts in finding a cognizable danger of recurrence adequate to support a district court's award of injunctive relief. See, e.g. , Wilk , 895 F.2d at 367-70 (holding that district court did not abuse its discretion in finding cognizable danger of recurrence-notwithstanding that it "wrongly placed the burden of proof on the [defendant]"-when defendant "expressed intent to comply" with the law, but also only discontinued challenged conduct as a result of litigation and "vigorously maintain[ed]" its challenged conduct was lawful); United States v. Laerdal Mfg. Corp. , 73 F.3d 852, 857 (9th Cir. 1995) (holding that district court did not abuse its discretion in finding a cognizable danger of recurrence when defendant introduced reforms "under protest" and because "past illegal conduct gives rise to an inference that future violations may occur"). By contrast, neither State Defendants nor our dissenting colleague identifies any case involving analogous facts in which the Supreme Court, this Court, or *366 any other appellate court held that a district court abused its discretion in awarding prospective injunctive relief.
The district court's decision also is consistent with this Court's admonition that "[a]n injunction should not be refused upon the mere ipse dixit of a defendant that, notwithstanding his past misconduct, he is now repentant and will hereafter abide by the law." United States v. Hunter , 459 F.2d 205, 220 (4th Cir. 1972). Given that State Defendants have shown no "repentan[ce]"-they continue to argue, as they are entitled, that the challenged conditions comply with the Eighth Amendment-State Defendants' professed intent not to return to the challenged practices did not preclude the district court from exercising its discretion to award injunctive relief.
2.
Next, State Defendants argue that the district court erred in holding that the PLRA did not bar the award of prospective injunctive and declaratory relief. Whether the PLRA authorized such relief presents a question of statutory interpretation that this Court reviews de novo. See Stone v. Instrumentation Lab. Co. , 591 F.3d 239, 242-43 (4th Cir. 2009) ; see also Dixon , 290 F.3d at 710 (providing for de novo review of questions of law bearing on a district court's decision to award an injunction)
The PLRA provides that "in any civil action with respect to prison conditions ... [t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). According to State Defendants, this language authorizes a court to award prospective relief only if there is an "ongoing constitutional violation." Appellants' Br. at 29. Emphasizing that Plaintiffs concede their current conditions of confinement comply with the Eighth Amendment, State Defendants argue that there is no longer an "ongoing constitutional violation" supporting the award of prospective relief.
In support of their position, State Defendants principally rely on the Ninth Circuit's opinion in Hallett v. Morgan , 296 F.3d 732 (9th Cir. 2002). At issue in Hallett was a motion by a class of state prisoners to extend district court jurisdiction over a consent decree entered several years earlier in a case involving alleged Eighth Amendment violations at the prison. Id. at 738-39. After holding an evidentiary hearing, the district court concluded that the alleged constitutional violations at the prison no longer existed. Id. at 739. Relying on that finding, the state argued that Section 3626 barred extension of jurisdiction over the consent decree because there was no longer a "current and ongoing" violation. Id. at 743. The Ninth Circuit agreed, stating that "[t]he text of § 3626(a)(1)(A) suggests that in the absence of a 'current and ongoing' violation, there is no occasion to fashion prospective relief to cure the violation." Id. at 743. "In other words, if a violation no longer exists, the statute does not permit the court to order prospective relief." Id.
Although we have great respect for the Ninth Circuit's opinion in Hallett , we are not persuaded to follow it. Specifically, Hallett's reference to "current and ongoing" violation-a phrase that does not appear in the text of Section 3626(a)(1) -appears to derive from Section 3626(b)(3), which provides that "[p]rospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to *367 correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3) (emphases added). By its plain terms, Section 3626(b)(3) addresses the termination of prospective relief, not the initial imposition of such relief, which is at issue here and governed by Section 3626(a)(1). Notably, Section 3626(a)(1) does not include the "current and ongoing" language, notwithstanding that the rest of the language in Section 3626(a)(1) regarding when initial prospective relief is available tracks the language in Section 3626(b)(3).
Additionally, Congress's decision to omit the "current and ongoing" language from Section 3626(a)(1), when it used such language in Section 3626(b)(3), provides strong evidence that Congress did not intend for the "current and ongoing" standard to apply outside of the termination context. See Russello v. United States , 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("Where Congress includes particular language in one section of a statute but omits it another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and alterations omitted)). That is precisely what the district court in this case and the Eleventh Circuit concluded in rejecting Hallett 's reasoning. See Thomas v. Bryant , 614 F.3d 1288, 1320 (11th Cir. 2010) ("[T]he 'current and ongoing' requirement is distinct from the standard governing the initial entry of injunctive relief."); Porter , 290 F.Supp.3d at 537 ("That Congress explicitly included an 'ongoing violation' requirement in the termination provision and omitted it from the initial relief provision implies that Congress did not intend for courts to be bound by the 'ongoing violation' requirement when determining whether equitable relief is initially available.").
Congress's decision to use the "current and ongoing" language in Section 3626(b)(3), but not in Section 3626(a)(1), also undermines the argument by State Defendants and our colleague in dissent that the phrase "necessary to correct" in Section 3626(a)(1) precludes the award of prospective relief when a constitutional violation no longer exists. Construing the phrase "necessary to correct" as demanding a "current and ongoing" violation would render redundant the phrase "current and ongoing" violation in Section 3626(b)(3), as that provision also requires that the court find the prospective relief "necessary to correct." But "[g]eneral principles of statutory construction require a court to construe all parts to have meaning and to reject constructions that render a term redundant." PSINet, Inc. v. Chapman , 362 F.3d 227, 232 (4th Cir. 2004) (citing Reiter v. Sonotone Corp. , 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ).
Further supporting Plaintiffs' construction of Section 3626(a)(1) is the well-established rule that courts "should not construe a statute to displace courts' traditional equitable authority absent the clearest command or an inescapable inference to the contrary." Miller v. French , 530 U.S. 327, 340, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000). Congress's use of "current and ongoing" in Section 3626(b)(3) demonstrates that it knew how to "clear[ly] command" that courts may not use their equitable authority in the case of a violation that is not "current and ongoing." Because Congress chose not to use that language or similar language, we will not construe Section 3626(a)(1) as displacing courts' equitable authority to initially impose prospective *368 relief, even when a violation is not "current and ongoing."
III.
Without question, "[m]aintaining safety and order at [a detention center] requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." Florence , 566 U.S. at 326, 132 S.Ct. 1510. At the same time, one of the "essential principle[s]" protected by the Eighth Amendment is that "the State must respect the human attributes even of those who have committed serious crimes." Graham v. Florida , 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). The challenged conditions on Virginia's death row deprived inmates of the basic human need for "meaningful social interaction and positive environmental stimulation." Amici Br. at 4. The undisputed evidence established that that deprivation posed a substantial risk of serious psychological and emotional harm and that State Defendants were deliberately indifferent to that risk. Accordingly, we affirm the judgment of the district court.
AFFIRMED

Virginia executed Gray on January 18, 2017.

Because we hold that a legitimate penological justification can support even prolonged solitary detention of a particular inmate, our colleague in dissent's suggestion that our opinion could "interfer[e]" with prison officials' ability to safely confine inmates housed at "the federal supermax prisons in Colorado and Illinois" is without merit. Post at 373. Put simply, if a prison official reasonably determines that, notwithstanding the emotional and psychological risks, prolonged solitary detention of an inmate is necessary to protect the well-being of prison employees, inmates, and the public, then confinement of the inmate in such conditions will not violate the Eighth Amendment. As explained below, State Defendants simply chose to abandon any such argument in this case.